# EXHIBIT 1

# CHEESWRIGHTS

SCRIVENER NOTARIES | LLP

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY the genuineness of the signature subscribed to the arbitration award hereunto annexed, such signature being in the own, true and proper handwriting of **ANGHARAD MYRA PARRY KC**, whose identity I attest, the arbitrator therein named and described.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this twenty third day of April in the year two thousand and twenty five.





 International Union of Notaries　　SCRIVENER NOTARIES

Regulated through the Faculty Office of the Archbishop of Canterbury
16 Eastcheap, London, EC3M 1BD　tel +44 (0) 20 7623 9477
email notary@cheeswrights.com　www.cheeswrights.com
Cheeswrights LLP is a limited liability partnership registered in England and Wales under number OC426084

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**

**International Arbitral Tribunal**

---

**ITALDESIGN GIUGIARO S.P.A.**

**Claimant**

**- and –**

**DELOREAN MOTOR COMPANY, INC.**

**Respondent**

**ICDR Case 01-23-0001-9491**

---

**FINAL AWARD**

---

**Introduction**

**This is the Final Award in ICDR Case 01-23-0001-9491. The Tribunal has read and considered all documents, evidence and submissions made by the Parties, and has carefully considered all matters raised in the Quantum Hearing. Both Parties confirmed at the end of the Quantum Hearing that they were satisfied with the conduct of the proceedings and that they had no objections to raise.**

---

**Brief Overview of the Dispute**

1. In January 2022, DeLorean Motor Company Inc ("DeLorean") engaged Italdesign Giugiaro SPA ("IDG") to design, engineer, develop and construct low speed show-car models and the related engineering pre-concept phase of a new, electric, version of the DeLorean car.

2. Although DeLorean engaged IDG in January 2022, it was on 19 July 2022 that the parties executed the formal Master Project Agreement ("MPA"), which recorded the terms pursuant to which the parties agreed to contract. The MPA contained the relevant arbitration clause at Article 23, providing for English law and arbitration under the

administration of the International Centre for Dispute Resolution ("ICDR")[1] and subject to its International Arbitration Rules.

3. Under the MPA, IDG was to undertake a series of projects as follows:

(i) Preparation and construction of six scale ¼ models (**Project A**);

(ii) Development of the complete design and engineering activities and construction of three low speed show car models (**Project B**);

(iii) Design researches and manufacturing of an exterior style hard model of an off-road GT vehicle (**Project C**);

(iv) Design researches and manufacturing of an exterior style hard model of a shooting break vehicle (**Project D**);

(v) Engineering pre-concept development services (**Project E); and**

(vi) Technical assistance during the event at Pebble Beach, Concours D'Elegance Event 2022,27 including a team of seven persons (**Project F**).

4. In respect of Projects A, B and E, DeLorean's approval for IDG to proceed with the work was given prior to the execution of the MPA by way of formal Conditional Notices to Proceed dated between 14 January and 24 March 2022. The Conditional

---

[1] Article 23 of the MPA provides as follows:

"23. *Law and Dispute Resolution:*

*23.1 The Parties agree that this Agreement shall be governed and construed in accordance with the law of England and Wales without regard to any conflicts of law provisions.*

*23.2 Should any dispute arise out of this Agreement including the interpretation thereof or any other matter specifically referred to herein the parties agree to negotiate for the settlement thereof by the following procedure: The Parties shall use all reasonable endeavours to promptly negotiate in good faith and settle amicably any dispute that may arise out of or relate to this agreement or a breach thereof within 14 Business Days of notification by one Party to the other of such dispute. If any such dispute cannot be settled amicably through ordinary negotiations by appropriate representatives of the Parties within such 14 days. The dispute shall be immediately referred to the Project Managers and the Legal Departments of both parties who shall meet (either by themselves or through their authorized representatives and either in person by telephone or through such other means of communication as may be agreed between them) in good faith within 14 Business Days of the request of either party in order to attempt to resolve the dispute within a further 14 Business Days from the initial date of such meeting.*

*23.3 In the event that the Parties are unable to resolve the dispute pursuant to Article 23.2 within six weeks or either Party at any time, acting reasonably, no longer considers that the matter may be resolved amicably the dispute shall be exclusively settled by arbitration in the English language before one arbitrator under the administration of the international Center for Dispute Resolution and according to its International Arbitration Rules. The seat of the arbitration will be England, and the place of hearing will be London, England. A Party may seek interim injunctive relief under these Rules and before any court having jurisdiction, and each Party hereby submits to the personal jurisdiction of any court reasonably chosen by the initiating Party for such purposes. The initiating Party shall reimburse the other Party's costs if the court declines jurisdiction. The arbitral panel will be empowered to grant injunctive relief upon application. Awards of the arbitral panel will be enforceable in any court having jurisdiction, and each Party hereby submits to the personal jurisdiction of any court reasonably chosen by the enforcing Party for such purposes. The enforcing Party shall reimburse the other Party's costs if the court declines jurisdiction. "*

2

Notices to Proceed were subsequently incorporated into Annexes to the MPA. In respect of Projects C, D and F, DeLorean's approvals were either given by email or confirmed by part payment of the relevant amount.

5. On 8 August 2022, DeLorean signed an Acceptance Report dated 2 August 2022 in relation to six 1:4 scale models, under Project A[2].

6. On, the same date 8 August 2022, DeLorean signed an Acceptance Report dated 2 August 2022, in relation to the First Showcar Alpha V, under Project B[3].

7. On the same date 8 August 2022, DeLorean signed an Acceptance Report dated 2 August 2022 in respect of a 1:1 exterior scale model under Project C.[4]

8. On the same date, 8 August 2022, DeLorean signed an Acceptance Report dated 2 August 2022 in relation to a one 1:1 exterior scale model under Project D[5].

9. Some but not all of the Deliverables under Project E have not been provided, though IDG stated they stood ready to provide the remaining deliverables[6].

10. IDG stated that technical assistance was provided at Pebble Beach as Project F, but no Acceptance Report has been signed by DeLorean.

11. Between June 2022 and September 2022, IDG issued a series of invoices to DeLorean for the services under the MPA ("the Invoices"). IDG's pleaded case was that the sums due under the Invoices totalled € 3,885,271.47.

12. IDG relied on Articles 5 and 9 of the MPA (considered further below) and argued that the Invoices had all fallen due by 27 August 2022.

13. DeLorean had not paid the Invoices.

14. There were numerous written communications from DeLorean to IDG in which, on IDG's case, DeLorean had admitted the totality of the sums owing under the Invoices.

---

[2] **Exhibit Section C: 41** : Project A Acceptance Report **(C-15)**
[3] **Exhibit Section C 42**: Project B Acceptance Report **(C-16)**
[4] **Exhibit Section C-43**: Project C Acceptance Report **(C-17)**
[5] **Exhibit Section C 44:** Project D Acceptance Report **(C-18)**
[6] IDG Skeleton §79, IDG's application for ED §18(b)

3

15.    IDG brought a claim in debt, alternatively damages for breach, for the non-payment of the Invoices. IDG argued that, by the above-referred communications, DeLorean had expressly admitted that the invoices are due and payable (and had indeed paid some of the invoices).

16.    IDG claimed the sum alleged outstanding, plus interest, costs and interest on costs.

17.    In the arbitration, DeLorean denied that it was liable to pay the Invoices (and/or denied that it was liable to pay the total sum under the Invoices, though it did not admit any specified sum).

**Procedural History**

18.    On 28 April 2023, IDG, through its lawyers, filed the Notice commencing this arbitration, noting that it intended to seek leave to request an early disposition of the arbitration. There had been correspondence between the Parties pre-dating the Notice of Arbitration: On 19 December 2022, IDG's General Counsel, Ms Emanuela Franco, wrote to DeLorean recalling DeLorean's failure to pay the Debt, and inviting it to engage in amicable settlement discussions. On 28 February 2023, IDG wrote to DeLorean (this time through lawyers), inviting DeLorean again to make payment of the Debt plus accrued interest at a rate of 7% per annum, in accordance with Article 9.2 of the MPA, as well as any legal costs incurred by IDG.

19.    On 9 June 2023, DeLorean, through its lawyers, filed the Answer to the Notice.

20.    On 25 October 2023, the ICDR confirmed the appointment of Ms Angharad Parry as sole arbitrator.

21.    On 4 December 2023, the parties took part in a virtual procedural hearing in which they advanced oral submissions on IDG's application pursuant to Article 23.1 of the ICDR Rules for leave to submit the ED Application (the **Permission Application**). By Procedural Order No. 1 dated 8 December 2023 (**PO1**), the Tribunal granted the

4

Permission Application and directed that the parties exchange two rounds of submissions in support of the ED Application. In accordance with those directions:

(i) On 22 December 2023, IDG filed its written submission in support of the ED Application;

(ii) On 26 January 2024, DeLorean filed its response to DeLorean's written submission in support of the ED Application (the "**Response**"). The Response was accompanied by three witness statements from Stephen Wynne, Joost de Vries and Ben Marquart and seven factual exhibits;

(iii)On 28 February 2024, IDG filed its reply submissions in response to the Response (the "**Reply**"); and

(iv)On 8 April 2024, DeLorean filed its response to IDG's reply (the **Rejoinder**).

22.    On 29 May 2024, the parties filed skeleton arguments in advance of the virtual oral hearing scheduled for 2.30 pm London time on Tuesday 4 June 2024. On 29 May 2024, the parties also filed a Dramatis Personae and Issues List in agreed form. DeLorean and IDG did not produce an Agreed Chronology.  IDG produced a Chronology to which DeLorean made reservations and comments.

23.    On 4 June 2024 at 2.30 pm, a hearing took place attended remotely.  IDG were represented by their lawyers from RPC, namely Mr Shai Wade, Ms Ana Margetts and Mr Fred Kuchlin. DeLorean were represented by their lawyers from Holland & Knight, namely Mr Josafat Parades and Ms Laura Zielinski.

24.    At the hearing, the Tribunal identified a discrepancy on the figures between IDG's Schedule for Project A and the invoices[7].  IDG's representatives provided an oral explanation for this at the end of the hearing.  The Tribunal requested a written explanation and consequential amendments to pleadings as appropriate from IDG's side, further to the oral explanation, with an opportunity thereafter for DeLorean to give any further comments in writing.

---

[7] Transcript of ED Hearing p88

25.     Both Parties confirmed orally at the end of the hearing that they had no concerns as to the procedural conduct of the reference (subject to their over-arching positions on their appropriateness or inappropriateness of the early disposition procedure).

26.     On 7 June 2024, IDG's lawyers provided a short note[8] relating to the Hearing Bundle, together with an appendix, and an Amended Chronology showing an amendment to line item 18 in tracked changes.  IDG's position was that the spreadsheet found at [Exhibit **C-66**], being an IDG internal spreadsheet containing the amounts invoiced under the MPA, *"contains a clerical error in relation to invoice number 2022101565 in that it erroneously states the invoice relates to Project A when in fact it relates to Project B."*

27.     On 14 June 2024, DeLorean's lawyers responded with their comments on the IDG's note. They vigorously contested aspects of the commentary made by IDG's legal team (as will be explored further below), especially relating to the Change Order of 19 March 2022.

28.     On 21 June 2024, IDG's lawyers responded further to state that there were potentially misleading statements in the email of 14 June 2024, when DeLorean was aware of the correct position. Again, this related to the Change Order of 19 March 2022 and payment plan related thereto.  They requested permission to admit the following documents to the record:

    (i)     An email from Andrea Porta of IDG to Joost de Vries, Dean Hull, and Ben Marquart of DeLorean dated 3 March 2022, attaching four documents relating to IDG's proposed amendments to the contractual scope of Project B (including the revised payment plan) (the **Project B Amendments**); and

    (ii)    An email from Dean Hull to Andrea Porta (copying Ben Marquart) dated 19 March 2022, attaching the Conditional Notice to Proceed in relation to the Project B Amendments. The Conditional Notice to Proceed is at **[Exhibit -C-C15]** of the Hearing Bundle and **[Exhibit B-3]** of the Projects Bundle.

29.     On 24 June 2024, the Tribunal replied admitting the documents to the record, as they were relevantly responsive to the statements which were, on IDG's characterisation,

---

[8] [Exhibit Section **C-66; [C-49]**]

"potentially misleading". The Tribunal requested that DeLorean comment on the new documents by end of 27 June 2024.

30.    On 26 June 2024, DeLorean's lawyers responded indicating that they had not been able to open all the documents provided by IDG's lawyers on 21 June 2024. Further, they expressed concerns that (i) these documents were admitted to the record when DeLorean's Ryan Wynne had not been allowed to give ex tempore oral evidence at the early disposition hearing, and (ii) the early disposition was being protracted by submission of additional documents by IDG: this indicated the lack of unsuitably of the early disposition procedure.

31.    On 28 June 2024, IDG's lawyers provided the documents again in a different format. On the same date, the Tribunal indicated that, if DeLorean's lawyers could now access these documents, they should comment thereon by end 2 July 2024. The Tribunal further explained the difference in treatment of Mr Wynne's proposed oral intervention at the hearing and the documents at issue here, stating as follows:

*"The Respondent has expressed a concern that it perceives a disparity in treatment between the non-admission of oral evidence from Ryan Wynne during the hearing and the admission of the Claimant's documents in response to what the Claimant alleges were "misleading" statements by the Respondent. The Respondent should be assured that there is no disparity of treatment: the situations are procedurally different. A party, when faced with a statement that it maintains is misleading, will be afforded an opportunity to put forward a response to the allegedly misleading statement: and typically will seek to rebut by reference to documentary evidence. (The Tribunal makes no comment whatsoever in this email as to whether, in this instance, the statement referred was misleading or not). This can be contrasted with a situation where a representative offers to give "new" oral evidence at a hearing when the parties had already submitted written witness statements and had agreed to dispense with oral examination at the relevant hearing."*

32.    DeLorean's lawyers reverted on 1 July 2024 and indicated that they could open the documents at issue, and that they would provide any further comments by 2 July 2024. On 2 July 2024 they reverted further indicating that they had no further comments in

7

relation to the documents, and reiterated their overall position of rejection of early disposition.

*Early Disposition Application Order & Reasons*

33.    On 21 August 2024, the Tribunal rendered its Order and Reasons in the Early Disposition Application. Both Parties had argued that, on the ED Application, the Tribunal should either award the sums claimed in their entirety or dismiss the ED Application and make further directions.[9] The Tribunal was not satisfied that the entirety of the debt could be awarded based on the evidence presented during the ED Application, and therefore dismissed the Application.

34.    The Tribunal, however, found that it was manifestly frivolous to argue that DeLorean had not admitted a debt to IDG. It had made an admission, but on the ED Application, the Tribunal was unable to determine either the sum of the debt or the sum of any admitted debt.[10]

35.    The Tribunal also considered the defences put forward by DeLorean in its ED Application List of Issues and concluded that:

   (i)    DeLorean's defence that IDG had subjected it to duress and/or coercion in signing the MPA and the Acceptance Reports was manifestly hopeless as a matter of English law and no further evidence from DeLorean could alter this position.[11]

   (ii)   DeLorean's defence based on alleged misrepresentation by IDG was manifestly meritless, frivolous or hopeless.[12]

   (iii)  DeLorean had pleaded various breaches of the MPA by IDG. However, DeLorean did not advance any counterclaim and did not plead any set-off whatsoever. Therefore, as a matter of law, there was no route whereby the alleged breaches by IDG (even if they had been proved, which they were not), could have relieved DeLorean of its own liability for sums owing (and admitted owing) to IDG.[13]

---

[9] Early Disposition Application Order & Reasons §40, Transcript of Early Disposition Hearing [ p100-105]
[10] Early Disposition Application Order & Reasons §158 - 162
[11] Early Disposition Application Order & Reasons §94 - 119
[12] Early Disposition Application Order & Reasons §113 - 119
[13] Early Disposition Application Order & Reasons §§120 - 147

8

(iv) DeLorean also argued that IDG had failed to prove the sum of the debt owing to IDG (even if DeLorean accepted that admissions made as to debt owing). The Tribunal accepted that further submissions were necessary as to the sum of the debt.[14]

*Procedure after the Early Disposition Application*

36.   After receipt of the Early Disposition Application Order and Reasons, the Parties then both made written submissions as to next procedural steps.

37.   A timetable was agreed between the Parties as regards service of submissions as to quantum, although the timetable was extended by agreement on occasion.

38.   On 12 September 2024, IDG served submissions as to the quantum of the Debt owed to them.

39.   On 10 October 2024, DeLorean served submissions on the quantum of the Debt.

40.   On 11 December 2024, IDG served its reply submissions on the quantum of the Debt.

41.   The Parties agreed an extension to early January for DeLorean to serve its planned rejoinder submissions. However, DeLorean did not serve any rejoinder. This is considered further below.

*Document Production Phase*

42.   The Tribunal made Procedural Order No 3 on 10 September 2024, which provided an onwards timetable for the document production phase.

43.   On 18 October 2024, IDG and DeLorean exchanged Document Requests in Redfern Schedule Form. After the standard exchanges between the Parties in Redfern form, the outstanding objected Document Requests were determined by the Tribunal on 8 November 2024.

44.   The Tribunal ordered that DeLorean disclose:

---

[14] Early Disposition Application Order & Reasons §1146 - 161

9

(i)  Its internal documents relating to the amount of the debt claimed by IDG and the content of any of the invoices comprising the debt, dated from 28 July 2022 to 28 February 2023.

(ii) Its financial statements such as, but not limited to, its balance sheet, profit and loss statement, cashflow statement, directors' report and any notes to the accounts and any documents evidencing the identify and composition of DeLorean's creditors in such financial statements, for financial years ending on or after 28 July 2022 to the date of order.

45.   The Tribunal ordered that IDG provide a list of the date and time on which the Deliverables under Project E were provided to DeLorean between April and July 2022 and the medium of delivery.  If DeLorean were then unable to identify such documents within its possession and control, it could renew its application.

46.   IDG provided the ordered List on 15 November 2024.

47.   On 16 November 2024, DeLorean disclosed documents relating to its financial statements.  DeLorean advised that, despite its best efforts, it had been unable to locate documents within the category of internal documents relating to the amount of the Debt claimed by IDG, and the content of any invoices comprising the Debt, dated from 28 July 2022 to 28 February 2023 inclusive.  DeLorean advised that it was continuing to look for documents within this category.

48.   On 22 November 2024, IDG stated its dissatisfaction with DeLorean's position.  It requested that DeLorean provide the category of internal documents urgently and as soon as possible. IDG further complained of the adequacy of the disclosure provided under the category of financial statements, particularly that documents did not cover the identity and composition of DeLorean's creditors.  IDG reserved all its rights, including to ask the Arbitrator to draw adverse inferences.

49.   On 27 and 28 November 2024, DeLorean advised that, despite best efforts, it had not been possible to locate any further documents under either category.

10

50. On 29 November 2024, IDG reiterated that it did not find DeLorean's position credible, reserved the right to request adverse inferences be drawn, and requested confirmation of the search parameters used by DeLorean.

51. On 3 December 2024, DeLorean reiterated its previous position.

52. On 23 December 2024, IDG restated its dissatisfaction and stated that it would invite the Arbitrator to draw adverse inferences.

*Developments in early 2025*

53. DeLorean's Rejoinder had been due, by agreement between the Parties, early in January 2025.

54. DeLorean did not serve its Rejoinder by the deadline (as extended) and, on 9 January 2025, evinced an intention not to do so. On 9 January 2025, the Tribunal ruled that it would no longer admit any Rejoinder to the record.

55. By further correspondence on 9 January 2025, IDG requested that the Tribunal decide the matter on documents and not proceed to a hearing. On the same date, DeLorean indicated that it wished the hearing to go ahead.

56. On 9 January 2025, the Tribunal ruled that the hearing would take place as planned on 22 – 23 January 2025, with Skeletons (capped at a maximum of 15 pages) being submitted in advance.

57. By its determination of 9 January 2025, the Tribunal stated:

*"The Respondent has confirmed by its email of 9 January 2025 that it does not intend to raise any new substantive factual or legal points in its skeleton arguments or in oral submissions at the hearing. The Claimant, having raised these concerns, must share this intention not to adduce any new substantive factual or legal points in its own skeleton arguments or in oral submissions at the hearing. The Tribunal will hold both Parties to this."*

11

*Hearing*

58. A hearing took place by remote medium of Teams on the afternoons of 22 and 23 January 2025. The Arbitrator was physically present in London during the hearing.

59. IDG was represented by its legal team of Mr Shai Wade, Mr Fred Kuchlin and Ms Ana Margetts.

60. DeLorean was represented by its legal team of Mr Josafat Paredes and Ms Genoveva Silva.

61. The only witness who attended the hearing – and who gave evidence on a remote basis – was Mr Marquart, who had been employed by IDG. IDG had on 13 January 2025 sought to cross-examine both Mr de Vries, who had given witness statements for DeLorean. This was only 9 days before the hearing and therefore outside the requisite 15 day period set down by paragraph 42 of PO2 provided as follows:

    "*At a date prior to the hearing and in accordance with ICDR Rule Article 26(5), no less than 15 days prior to the hearing each Party shall notify the other Party and the Tribunal of which witnesses it intends to cross-examine.*"

62. Given the time lines, on 19 January 2025, the Tribunal declined to order that Mr de Vries be required to attend for cross-examination. The Tribunal did however remind the Parties of Paragraph 40 of PO2 which allowed the Tribunal to determine weight to be given to evidence even without cross-examination.

63. One particular important issue arose at the start of the hearing. IDG's legal representatives sought confirmation that DeLorean's legal representatives had authority to act for DeLorean in the hearing. This issue became live on Day 1 of the Quantum Hearing given that no DeLorean representatives were present. This was against a backdrop where IDG had concerns as to the financial solvency and consequent legal status of DeLorean. These concerns as to whether DeLorean was insolvent had been raised inter partes in correspondence in January 2025 but IDG did not consider that it had received satisfactory answers from DeLorean (or its legal representatives).

64. When the issue was raised, Mr Parades for DeLorean replied:

12

> "*Well, we have been instructed by our client to*
>
> *attend the hearing today, we have that instruction*
>
> *through different communications, so maybe we think that*
>
> *if it works for the claimant we can ask our client to*
>
> *send an email to the arbitrator stating that we are*
>
> *authorised to act in this hearing.*
>
> *THE SOLE ARBITRATOR:  I think that that will be a sensible*
>
> *precaution.  Would that allay any concerns from the*
>
> *claimant's side?*
>
> *MR WADE:  At the present time, yes, Madam Arbitrator*"[15]

65.     Mr Paredes emailed Mr Wynne of DeLorean. Later on the same day, the Tribunal recorded the following:[16]

> "*Mr Paredes, before you start, I just want to put on*
>
> *record the tribunal has received during the break*
>
> *an email from Mr Paredes, in copy to Mr Ryan Wynne of*
>
> *DeLorean, asking Mr Wynne to confirm his understanding*
>
> *and authorisation that Holland & Knight act as counsel*
>
> *and the company's representative at the arbitration*
>
> *hearing.  At 4.18 I received, with all parties in copy,*
>
> *a message from Mr Ryan Wynne of DeLorean stating:*
>
> *"The email below from our counsel is accurate and on*
>
> *behalf of DMC I confirm as much."*

---

[15] Transcript Day 1/p5
[16] Transcript Day 1/p50 – p51

13

66. On Day 2 of the Quantum Hearing, IDG's legal representative Mr Wade stated as follows[17]:

> *"the history is that*
>
> *the issue arises after Holland & Knight's beautifully*
>
> *crafted (but, nevertheless, rather evasive) answer on*
>
> *16 January to our question of whether DeLorean was*
>
> *insolvent and they said at the moment the proceedings*
>
> *lack any relevance and therefore they didn't answer and*
>
> *the issue became more focused when none of DeLorean's*
>
> *officers were available yesterday at all in any form as*
>
> *representatives or witnesses.*
>
> *We had Mr Wynne's confirmation of his understanding*
>
> *but he doesn't actually confirm per se that he is in*
>
> *a position to give instructions, he just confirms his*
>
> *understanding that Holland & Knight are instructed.*
>
> *All of that being said, we do rely on -- and I say*
>
> *we, by we I mean my client relies on the representation*
>
> *of Holland & Knight that they are satisfied that they*
>
> *are duly authorised to act on behalf of the respondent*
>
> *and in as far as we have that assurance that they are*
>
> *properly instructed, then that is accepted.  Obviously*
>
> *we fully appreciate that the respective law firm would*
>
> *not have made such a representation if it weren't true.*
>
> *So we are happy to proceed on that basis, leaving all*

---

[17] Transcript Day 2/p12/line 11 – p13/line 10

14

> *8      that issue then to one side.  If that's acceptable to*
>
> *9      you, Madam Arbitrator, I hope that is an acceptable*
>
> *10     basis to proceed on. "*

67. The Tribunal also considered that this was an acceptable basis to proceed. If the arbitration had had to be postponed due to the issue of authority, then it would have held off the resolution of the dispute – which would not have been desirable or time or cost effective. The Tribunal, like IDG, considers that if Holland & Knight represented that they were properly instructed, then that should be accepted, given that it would be a highly implausible (and most serious) for a law firm to have made such a representation if it were not true.

## The Parties' Arguments: Summary
### *IDG's Position: Summary*

68.   IDG's position was that, after the ED Application, it was still open to it to establish that the entire Debt was due.  To this end, it advanced the following main arguments:

(i) IDG submitted that DeLorean has admitted the Debt in full.[18]  IDG produced further documentary evidence, over and above that submitted in the ED Application, with a view to proving DeLorean's admission of the entire Debt. IDG argued that, if it succeeded on this head, the Tribunal need go no further: the admissions, if proved, would be dispositive of the entire case.[19]

(ii) The quantum of the Debt was also argued to be established by reference to the amounts IDG claimed due in respect of the work it had done, the Deliverables and Products that DeLorean had accepted from IDG.[20]

(iii) IDG advanced separate arguments as regards Project E.  IDG's first argument was that the proper interpretation of the Statement of Work in respect of Project E is that,

---

[18] Claimant Submissions on the Quantum of the Debt B§6-11; Claimant Reply Submissions on the Quantum of the Debt C§20 - 37
[19] Claimant Submissions on the Quantum of the Debt §11
[20] Claimant Submissions on the Quantum of the Debt §C12 - 198

15

following a downpayment, IDG was entitled to issue three separate invoices at monthly intervals following the commencement of work on the Project. IDG's entitlement to issue each invoice was not contingent on the provision of Final Project E Deliverables. Alternatively, if contrary to the foregoing interpretation, delivery of the Project Deliverables was a condition precedent to payment under the MPA, then IDG submitted that the vast majority of the Project E Deliverables had in fact been delivered and IDG would be entitled to payment for these Deliverables.[21]

(iv) IDG stressed that DeLorean had abandoned any Defences previously advanced, and that therefore the only issue between the Parties was the quantum of the Debt.

### *DeLorean's Position: Summary*

69.    DeLorean advanced various arguments in response to IDG's position. These arguments developed over the course of submissions:

(i) DeLorean initially purported to withdraw an admission of the Debt in full.[22]  As considered further below, DeLorean did not ultimately pursue this argument at the hearing.[23]

(ii) DeLorean denied that it had admitted the Debt in full[24].

(iii) DeLorean argued that IDG must prove a clear and unambiguous admission of the entire Debt, and that IDG was unable to discharge this burden of proof.[25]

(iv) DeLorean put IDG to strict proof of the sums claimed due in respect of Projects A – D and F and did not admit the sums claimed.[26]

(v) DeLorean denied that any of the invoices issued in respect of Project E became due and owing. First, DeLorean denied IDG's contractual interpretation that payment

---

[21] Claimant Reply Submissions on the Quantum of the Debt E §39 - 84
[22] Respondent Submissions on Quantum of Debt C§11 - 15
[23] DeLorean did not repeat the withdrawal in their Skeleton for the Quantum of Debt Hearing and at the hearing, it appeared to be common ground that DeLorean was no longer pursuing the withdrawal of the admission in full (Transcript Day 1/p14/lines 9 -16; Day 1/p56/lines 10-14).
[24] Respondent Submissions on Quantum of Debt B§4 - 8
[25] Respondent's Submissions on Quantum of Debt §10
[26] Respondent Submissions on Quantum of Debt D§16

16

could fall due without all Deliverables having been delivered. DeLorean argued that the agreed Deliverables needed to be delivered in accordance with the agreed timetable and then, only upon acceptance of those, would the relevant invoices become due and owing. DeLorean denied that IDG had delivered the requisite Deliverables to trigger the payment obligations and therefore it was too late for the sums to become contractually due.[27]

(vi) DeLorean argued that, if sums were not found due and owing to IDG, then IDG must return EUR 514,218.53 received from DeLorean.

## Whether DeLorean had admitted the Full Debt

### *Could DeLorean withdraw any admission of Debt previously made?*

70.    The first issue which arose is whether, even if DeLorean had admitted the Debt in full, it had withdrawn said admission. The Parties spent some significant time in written argument on this point. DeLorean purported to withdraw its admissions of Debt[28] but this was vigorously opposed by IDG in its Reply Submissions[29]. DeLorean did not take issue with the Reply Submissions and declined to serve a Rejoinder. DeLorean did not pursue its arguments as to withdrawal of any admission in its Skeleton.

71.    In their opening submissions at the hearing, IDG's counsel stated that they considered DeLorean to no longer be pursuing the withdrawal line of argument and reserved rights to address this point orally should DeLorean pursue it[30].

72.    DeLorean did not develop or even maintain this argument further at the hearing. Nor did DeLorean protest against IDG's characterisation that the argument had been abandoned.

73.    DeLorean is thus taken to have abandoned any argument that it could and did withdraw any admission made as regards the Full Debt. These arguments are not considered further in this Final Award.

---

[27] Respondent Submissions on Quantum of Debt E§ 17 - 36
[28] Respondent Submissions on Quantum of Debt §11
[29] Claimant Submissions on Quantum of Debt §5 - 19
[30] Transcript Day 1/9/lines 15 – 23; Transcript Day 1/14/ lines 9 - 16

*Has DeLorean Admitted the Full Debt?*

*The Parties' Submissions:  The Claimant's Submissions*

74.    IDG argued that the normal civil burden of proof should apply: there was no need for any different standard. IDG maintained that it discharged this burden satisfactorily (and indeed argued that the evidence it relied upon would also meet a "clear and unambiguous" test, though it denied that any such test should be applied).[31]

75.    IDG[32] relied upon contemporaneous documentary evidence to argue that the Entire Debt had been admitted by DeLorean. IDG adduced further evidence in addition to that it had relied upon at the ED Application.

76.    IDG adduced the WS Andrea Porta, which set out a chronology of admissions of the Entire Debt.

77.    The following were the key items relied upon by IDG:

(i) By letter dated 21 July 2022[33], Mr de Vries confirmed that the various models to be delivered under the MPA for the Concours d'Elegance Event in August 2022, and the related intellectual property, would remain IDG's property until

*"full payment of the total amount of Euro 4.399.400 (four millions three hundred-ninety nine thousand four hundred) as set forth in the relevant Annex 3 to the above-mentioned Offers.*

IDG submitted that this letter dated to a time when all the invoices were outstanding, and clearly stated the full sum of invoices then due and owing.[34]   The invoices making up this figure were found in the bundles at : C19.3 **[Exhibit C-77]**, C34 **[Exhibit C-26]**, C28 **[Exhibit C-22]**, C19.2 **[Exhibit C-90]**, C39 **[Exhibit C-31]**, C26 **[Exhibit C-20]**, C27 **[Exhibit C-21]**, C19.4 **[Exhibit C-93]**, C35 **[Exhibit C-27]**, C37 **[Exhibit C-29]** C29 **[Exhibit C-23]**, C31 **[Exhibit C-24]**, C36 **[Exhibit C-**

---

[31] Transcript Day 2/ Pages 31 - 36

[32] IDG's submissions were set out in writing at Claimant Submissions on the Quantum of the Debt, § 9–11; and evidence at Porta 1, §7–36; Respondent's Submissions on the Quantum of the Debt, §4–15)

[33] Factual Exhibit Section **C 45.1 |C-65|**

**28**], C38 [**Exhibit C-30**], C19.1 [**Exhibit C-97**], C32 [**Exhibit C-25**], C23 [**Exhibit C-19**], C46 [**Exhibit C-33**] and C45 [**Exhibit C-32**]. IDG argued that these invoices covered Projects A, B, C, D, E and F and that this further strengthened the argument that there was an admission of the full amount of the Debt.[35] The reason why this head line figure does not match the figure claimed by IDG in the arbitration is, IDG submitted, because of a later part payment by DeLorean.[36] IDG's position was that this letter was not a mere statement of the contractual price.

(ii)  By email dated 12 September 2022[37], Mr de Vries wrote to IDG again in the following terms:

*"Now that we have landed our 'anchor investor', and created a path to become a public company, things are starting to move forward rapidly again. We expect to fulfill our financial obligations to IDG under the following timeline.*

*Early next week we expect to make a first payment of $500,000 (Euro is almost at parity to the dollar now) to start showing progress.*

*In the week of 10/10 we expect to make a payment of $4,000,000 (most of our total obligation), we will try and accelerate 1 week but this is arriving funds dependent.*

*In the week of 10/31 we expect to transfer the remaining outstanding balance for 100% of the agreed projects"*

As of the date of this letter, the rough conversion of US$4,500,000 to €4,399,400.[38] IDG submitted that at the date of this email, the invoices were all still outstanding and therefore the position was the same on 21 July 2022.[39]

(iii)  By email dated 7 October 2022[40], Mr de Vries announced that DeLorean had made part payment of US$ 500,000 and said that *"full payment"* would follow *"next week"*. IDG submitted that, when taken together with the part payment of US $500,000.00,

---

[35] Transcript Day 2/38/lines 8 - 12

[36] Transcript Day 2/40/lines 1 - 18

[37] Factual Exhibit C 54.1 – 54.2 [**C-66, C-67**]

[38] Exchange rates taken from Oanda: **C-161**: Oanda exchange rate on 12 September 2022. [**C/54.3**]

[39] Transcript/ Day 2/38/lines 13 - 22

[40] Factual Exhibit **C-55.1 [C-70]**

this constituted a further admission of the full sum of the Debt.  (An internal IDG spreadsheet shows this payment being credited to IDG's account)[41].

(iv)    By email dated 24 October 2022[42], after being emailed by Mr Porta, one of DeLorean's directors, Stephen Wynne, said that: "*We are trying very hard to have Ital paid in full this week*".

(v)    On 16 November 2022[43], there was a meeting via Microsoft Teams between IDG and DeLorean at which Mr de Vries claimed that DeLorean had just concluded a round of external investment, after which DeLorean would be able to pay its debt. Mr de Vries reiterated this message in an email sent later the same day.

(vi)    On 19 December 2022,[44] IDG sent a further letter requesting payment of all of the outstanding invoices.

(vii)    By text message on 21 December 2022[45], Mr de Vries said that he was hoping to receive "[good] *news later today*" in relation to the alleged external investment.

(viii)    By email dated 1 February 2023[46], Mr de Vries said: "*Small quantity funds are finally arriving in escrow in Canada (and therefore to us) that will allow us to pay our debs* [sic]. *The bigger anchor that we need to fulfill* [sic] *our obligation to you has signed its binding subscription agreement*".

(ix)    By text message dated 17 February 2023[47], Mr de Vries said: "*Received a couple of hundred thousand. Not enough to make a meaningful payment against our debt. It's started to flow and expect to see more coming through now*".

(x)    By text message dated 22 February 2023, Mr de Vries said: "*Big checks are coming soon. They keep promising late this week, early next. Imminent…*".[48]

---

[41] Exhibit **C-56**
[42] Exhibit C-71 referenced at WS Porta §23
[43] Factual Exhibit C **58.2 [C-72]** and Factual Exhibit **C 58.3 [C-73]**
[44] Factual Exhibit C **59 [C-34]**
[45] Factual Exhibit **C 59.1 [C-74]**
[46] Factual Exhibit **C 60 [C-35]**
[47] Factual Exhibit **C 61[C-36]**
[48] Factual Exhibit **C 62 [C-37]**

20

78.     IDG further requested that the Tribunal draw adverse inferences against DeLorean based on DeLorean's response to disclosure requests. DeLorean was ordered to disclose to IDG its internal documents relating to the amount of the Debt and the content of IDG's invoices (IDG's Request No 1) but produced no documents under this head.  DeLorean was also ordered to provide its financial statements (IDG's Request No. 3) and produced only two documents in this regard.  IDG repeatedly queried the lack of documentation in response to these two Requests and argued that DeLorean's position was not credible. IDG requested that the Tribunal draw adverse inferences to the effect that there must be undisclosed documents, which contradicted DeLorean's pleaded case and which contained admissions that DeLorean regarded itself as liable for the full sum of the Debt.

79.     IDG further supported this argument by reference to Mr Marquart's oral evidence, in which he stated that DeLorean had data rooms of financial documents. IDG thus concluded that there would have been more financial documents for disclosure.[49]

80.     IDG further argued that adverse inferences should be drawn from the fact that Mr De Vries and, though to a lesser extent, Mr Wynne did not attend for oral cross-examination, despite having given witness statements.  IDG submitted that it "*beggared belief*" that DeLorean did not proffer a witness for oral cross-examination who could speak to the invoices.[50]

### *The Parties' Submissions:  The Respondent's Submissions*

81.     DeLorean did, at one stage, purport to withdraw any admission made.  This argument was not ultimately pursued, as discussed above, and therefore is not considered further.

82.     DeLorean's primary position was that it had admitted that a debt was due to IDG, but at no stage did it admit that the entire debt claimed and invoiced by IDG was due.[51]

---

[49] Transcript Day 2/Page 27/lines 7 - 14
[50] Transcript/Day 2/Page 27 lines 15 to page 28 line 10
[51] Respondent's Submissions on Quantum of Debt §4

83.     DeLorean argued that for IDG to succeed it needed to establish a "clear and unambiguous admission" by DeLorean.[52]    DeLorean denied that IDG had reached this alleged threshold[53].  DeLorean argued that IDG itself maintained that the standard was a *"clear and unambiguous admission"[54]*, but IDG denied this, alleging that DeLorean had misconstrued its submissions.[55]

84.     DeLorean placed different interpretations on the documentary evidence relied upon by IDG.

   (i) As regards the letter of 21 July 2022, DeLorean denied that this contained any wording that amounted to an admission of a debt due and owing.  On the contrary, DeLorean said that the letter merely reiterated Clause 7.6 of the MPA, namely that IDG would retain physical and intellectual property until full payment was made. Further, DeLorean denied that €4,399,400 was due and owing as of 21 July 2022 and stated that Invoice No 2022101638 had not been issued by then.[56]

   (ii) As regards Mr de Vries' email to IDG of 12 September 2022, DeLorean argued that Mr de Vries had indicated that DeLorean would make various payments, but this did not amount to a clear and unambiguous admission that any sums were in fact due and owing.  The email contained no reference to €4,399,400 or any other sum as being in fact due and owing.[57]

   (iii) As regards the emails of 7 and 24 October 2022, DeLorean argued that these begged the question as to what constituted "full payment". Neither email referred to the sum of €4,399,400 or any precise sum being due and owing[58].

   (iv) As regards the Teams conversation of 16 November 2022, DeLorean argued that a distinction must be drawn between not disputing a debt and admitting that a debt is

---

[52] Respondent's Submissions on Quantum of Debt §10
[53] Respondent's Submissions on Quanutm of Debt §10
[54] Respondent's Submissions on Quantum of Debt §6, referring to IDG's Application for Early Disposition §5 - 22
[55] Transcript Day 2/p32
[56] Respondent's Submissions on Quatum of Debt §5
[57] Respondent's Submissions on Quantum of Debt §6
[58] Respondent's Submissions on Quantum of Debt §7

due. The lack of contemporaneous protest should, DeLorean submitted, not be construed as an admission.[59]

    (v) As regards all the other messages relied upon by IDG, DeLorean maintained that Mr de Vries had correctly accepted that debts were due, but did not expressly admit the quantum of debt.[60]

85. DeLorean maintained that nowhere in the contemporaneous documents was there a clear and unambiguous admissions or acceptance of the specific amount of €3.8 million[61]. DeLorean's submitted that IDG relied solely on the referred documents and Mr Porta's Witness Statement, and that these failed to discharge the burden of proof, which lay on IDG.

86. DeLorean further argued that Mr Marquart did not, in his oral cross-examination, give any admission as regards a specific amount being due and owing to IDG.[62]

87. DeLorean argued that no adverse inference could be drawn as regards the failure to proffer other witnesses for cross-examination given that IDG had only requested cross-examination late, after the deadline imposed by the Procedural Order.

### *Discussion and Findings*

88. The issue between the Parties was whether the entire debt had been admitted due and owing to IDG, or whether only some lesser sum had been admitted. DeLorean could not escape the fact that it had admitted that some debt due and owing, as DeLorean itself sensibly acknowledged both in submissions and at the hearing.[63]

### *Standard of proof*

89. The threshold of proof to be reached was the normal civil standard of balance of probabilities. There was no valid basis in English law proffered by DeLorean for its argument that the threshold to be reached was a "*clear and unambiguous admission*". There was no common ground between the Parties that this "clear and unambiguous

---

[59] Respondent's Submissions on Quantum of Debt §8

[60] Respondent's Submissions on Quantum of Debt §9

[61] Transcript Day 2/p50/lines 2 - 6

[62] Transcript Day 2/p/52/lines 22 to page 53 line 4

[63] Respondent's Submissions on Quantum of Debt §4; Transcript of Hearing

admission" was the standard to be applied: rather, this was DeLorean's own assertion. It appears to have derived from a misreading of IDG's earlier submissions.

90. **The Tribunal finds that the standard English law standard of civil proof applies: IDG must prove their case on the balance of probabilities.**

*Discussion of the evidence*

91. The evidence turned heavily on the construction of the contemporaneous documents[64]. Turning to these:

(i) The letter of 21 July 2022: both Parties considered this letter in detail. As of 21 July 2022, IDG had raised invoices across all Projects A through F, except for Invoice 2022106183 in the sum of €285,000.00 in relation to the third month of Project E.[65] This letter is significant as containing the figure of €4,399,400, tying this figure to the concept of "full payment" and linking the figure to the Annex 3 offers. The letter did contain an effective restatement of the contractual position as to the retention of IDG's property rights until full payment. However, given the date of the letter, and the figures referred to, it is difficult indeed to see why DeLorean would have issued such a letter if they had not believed the figure referred was due and owing. This interpretation is not undermined by the fact that an invoice remained outstanding under Project E, if these invoices were being raised in a fixed sum monthly (which they were: this is considered further below). The divergence between the figure stated in the 21 July letter and the figure claimed was effectively explained by IDG by reference to the part payment made later by DeLorean. This accounted mathematically for the difference. IDG's arguments were compelling as to the importance of the 21 July letter when viewed in light of subsequent correspondence were compelling. There was a clear narrative arc which commenced with this letter.

(ii) 12 September 2022: This continued the narrative arc. Mr de Vries wrote to IDG indicating that DeLorean was shortly going to transfer US $500,000.00 and then shortly thereafter US$ 4,000,000, which was described as almost the total obligation.

---

[64] All references given above
[65] Claimant's Submissions on the Quantum of Debt §173; Respondent's Submissions on Quantum of Debt §5

Further payments to make up the balance were promised after that. At this stage, all invoices would have been received by IDG. At the then conversion rate, the figures referred gave a conversion of €4,399,400: being the contractual figure (before the partial payment). When taken together with the letter of 21 July 2022, the overwhelmingly most plausible construction is that DeLorean were admitting the entirety of the Debt owed pursuant to the invoices presented. That there was no reference to the exact figure in EUROs did not stop this train of correspondence indicating on the balance of probabilities that there was an admission of the entirety of the Debt by DeLorean.

(iii)  7 October 2022:  The narrative of admission of the entirety of the Debt is further confirmed by Mr de Vries' correspondence of 7 October 2022. At this date, DeLorean had made a partial payment of US$ 500,000.00 and stated that "full payment" would follow the next week. Whilst no figure was expressly given in this communication as to what sum "full payment" would be, this communication needs to be read against the background of both the 12 September and the 21 July communications: a natural reading of this prior correspondence ties "full payment" to the contractual figure of €4,399,400 (or states a broadly equivalent figure in US dollars). Again, on the balance of probabilities, this correspondence when read in the entire narrative arc, can be seen as an admission that the Entire Debt fell due and owing.

(iv)  24 October 2022:  Mr Wynne of DeLorean wrote to IDG stating that DeLorean were trying to have IDG paid "in full" that week. Again, the most natural reading of this communication is that DeLorean was admitting that a debt was owed to IDG. Whilst no sum was mentioned in this email itself, again, it must be read against the entire chain of communication, which had already established by that stage what the "full" figure was. This email again makes entire commercial and linguistic sense if DeLorean were admitting the Debt in full. Any other construction is less likely and more strained.

(v)  November – December 2022 Communications:  Communications took place both orally and via text in November and December 2022 in which IDG was chasing for payment of the invoices due and owing and DeLorean representatives indicating that they hoped to pay after receiving external investment. Whilst DeLorean argued that

25

these communications did not constitute an acknowledgement of debt, it is more likely than not that – in context – DeLorean were holding out the hope of future payment because DeLorean believed itself (and had already admitted) that it was contractually obliged to make said payment. Indeed, it is significantly less likely that a commercial party would repeatedly indicate a hope of making payment if it did not consider that such payment fell due and owing. Again, the fact that there was no statement of the total figure in these communications must be considered in context. The total figure had already been admitted in earlier written communications, and there appears (at that juncture) to have been no dispute from DeLorean's side as to what the figure was.

(vi) <u>February 2023</u>: Mr de Vries communicated a hopeful message at least three times to IDG during February 2023. Both the messages of 1 and 17 February 2023 contained an acknowledgement of DeLorean owing a debt. Again, no figure was given, though there was a recognition that the debt was large. The lack of figure does not undermine the admission, and again the communications need to be read against the overarching backdrop of the prior communications between the Parties. Similarly, the most natural reading of a company holding out the hope of payment, is because that company does indeed believe that it owes the money.

92. IDG argued that the correspondence was consistent with their thesis that DeLorean had no money to pay, and were seeking investors to pay.[66] Thus, IDG maintained that the real block to payment impecuniosity on the part of DeLorean. The contemporaneous communications support this theory.

93. There was an admission by DeLorean's counsel, when examining the partial payment evidenced by the wire payment at Exhibit **C-70**, that DeLorean were trying to find investors and were trying to provide for payment to be made[67]. DeLorean's counsel were careful to maintain their argument that no figure had been admitted. However, the partial payment and the documentation evidencing it must be read against the background correspondence – in which the overall contractual figure was admitted on any natural meaning. Again, therefore, when taken in context, the admitted seeking of

---

[66] Transcript Day 2/Page 26/1 - 15
[67] Transcript Day 1/Page 64/lines 7 - 17

26

investors to facilitate making a due payment confirms the admission of Debt, with the precise figure being set out elsewhere in correspondence.

*The evidence of Mr Marquart*

94.    The evidence of Mr Marquart added little to the debate about what figure had been admitted by DeLorean. Mr Marquart's evidence was that his role at the relevant time (ie. During 2022) focussed *"around the technical side of things"[68]*;  he was not in finance or legal and did not have detailed or specific knowledge of DeLorean's financials[69].    Even later, when he became Chief Technical Officer in 2023, Mr Marquart's evidence was that he did not have sight of detailed financial information[70]. He also found it difficult to recall much from the relevant time frame in 2022.

95.    The combination of lack of recall together with the stated limitations of role meant that his evidence did not significantly advance the debate on what figure (if any) DeLorean had admitted to IDG.   Indeed, Mr Marquart could not recall the correspondence containing figures (as relied upon by IDG) and indicated that it would not have been within his job scope at the time to issues surrounding the balances of sums due or owing.[71] Mr Marquart's evidence was also that he did not become Chief Technical Officer until summer 2023, and that therefore in 2022, he was not involved in DeLorean's attempts to raise finance from third party investors.[72] Further, Mr Marquart had not been in copy contemporaneously on certain of the communications shown to him in cross-examination, which limited his ability to speak to them.[73]

96.    There was thus a very limited number of points that could be usefully drawn from Mr Marquart's evidence.

(i) Mr Marquart was aware at the relevant time that DeLorean was looking to pay debts it owed to IDG.[74] (He was not then aware of the total figure of that debt).

---

[68] Transcript Day 1/Page 86/lines 9 - 15
[69] Transcript Day 1/Page 87/lines 1 - 8
[70] Transcript Day 1/pages 108 - 109
[71] Transcript Day 1/Pages 101 - 103
[72] Transcript Day 1/Page 106
[73] Transcript Day 1/Pages 104 - 105
[74] Transcript Day 1/Page 105/lines 5 - 8

27

(ii) Mr Marquart confirmed that as of 26 September 2022, DeLorean required funding to continue with its project with IDG.[75]

(iii) Mr Marquart stated that *"the P&L of the organisation and like, how much, you know cash on hand versus cash looking for and debt, or any, or in depositions or what like, like the kind of the financials of the organisation, those all lived in the data room...."*[76]

(iv) Mr Marquart indicated in a heavily caveated way that, as of summer 2022, there was a degree of willingness from DeLorean's part to keep working with IDG.  On 5 July 2022, Mr Marquart texted[77] Mr Porta of IDG indicating that he would *"like to see the IDG pitch/proposal for the total concept phase work, not just the aero "*.  Mr Marquart accepted that he was inviting IDG to participate in the future of the project with DeLorean[78].  He did not accept that this meant he was satisfied with their work, but more that it might be less troublesome not to replace them[79].

*Other witness evidence*

97.    No other witnesses gave evidence.  IDG argued that inferences should be drawn from the failure of DeLorean to proffer for cross-examination either Mr Wynne or Mr de Vries, despite them having given witness evidence. DeLorean countered that IDG had requested cross-examination out of time.  In light of the procedural time line, no adverse inference will be drawn from DeLorean's failure to proffer either of its other two witnesses for cross-examination.

98.    However, it is noted that – as remarked in the Early Determination Hearing – neither Mr Wynne nor Mr de Vries in their witness statements denied making admissions of debt (although they did not speak to a figure)[80].

---

[75] Transcript Day 1/Page 100
[76] Transcript Day 1/Page 108/lines 5 - 12
[77] Exhibit **C-10.2** (Bundle p574)
[78] Transcript Day 1/Page 96 lines 10 - 12
[79] Transcript Day 1/Page 96 line 24 – Page 97 line 11
[80] Claimant's Skeleton Argument for 4 June 2004 hearing: §96 - 97

28

*Adverse Inference on Documents*

99.    IDG requested that the Tribunal draw adverse inferences based on DeLorean's failure to provide the ordered disclosure as regards internal documents relating to the amount of the Debt and the contents of IDG's invoices, and DeLorean's undisclosed financial statements. Only two of the latter category of documents were disclosed.[81]

100.    It was surprising that DeLorean were unable to locate documents falling into these categories as it would seem highly likely that such documents would exist or would have existed. This presumption of existence of the relevant categories of documents was further strengthened by Mr Marquart's evidence that there was a data room of financial documents[82]. It stands to reason that at least some further documents in the ordered categories would have existed within the referred data room.

101.    The Tribunal therefore draws the adverse inferences requested by IDG in respect of the non-disclosure of these categories of documents. In other words, it can be inferred that documents likely existed which referred to the quantum of the Debt owing to IDG and/or contained some forms of admissions of liability for the entirety of the Debt. It can be inferred that documents in the ordered categories which contradicted DeLorean's pleaded case.

102.    This adverse inference is supportive of IDG's case, but is not determinative. It does not need to be as the issue of admissions can be disposed of on the basis of the documentary evidence.

## Conclusion on Admission by DeLorean

103.    Contemporaneous correspondence demonstrates that DeLorean repeatedly admitted in writing liability for its Debt to IDG and repeatedly indicated an intention to pay said Debt "in full".

104.    The contemporaneous documents when read in its entirety, particularly the narrative arc relied upon by IDG, demonstrate that DeLorean was admitting the full contractual

---

[81] Transcript Day 2/page 26/line22 – page 27/line 14
[82] Transcript Day 1/Page 108/lines 5 - 12

29

Debt to IDG. IDG meets the requisite standard of proof, which is the standard English civil standard (balance of probabilities). Indeed, the Tribunal finds that IDG exceeds the threshold of proof by a considerable margin. There is no requirement for IDG to establish an "unambiguous" admission, but the correspondence taken as a whole is factually unambiguous.

105. That DeLorean was admitting the full contractual sum as the Debt is further supported by other corroborating facts. DeLorean was relying on sourcing external investments to pay its Debt and to continue funding the project onwards with IDG. DeLorean was willing to continue working with IDG (even if perhaps reluctantly) if it could source funding to do so. This would be implausible behaviour on DeLorean's part if DeLorean had genuinely been disputing the sums owing to IDG (eg. due to dissatisfaction with work product).

106. Similarly, DeLorean made a partial payment with promises of the balance to follow. Again, this is consistent with the finding from correspondence that DeLorean had admitted the entirety of the Debt.

107. **The Tribunal therefore finds as a fact that DeLorean admitted the entire Debt owing to IDG in the sum of €4,399,400, which when taking into account partial payment by DeLorean left outstanding an admitted Debt of €3,885,271.47[83].**

108. **This point would be, of itself, dispositive of the case. DeLorean has already made a part payment towards the Debt and therefore DeLorean is now liable to IDG in the sum of €3,885,271.47, before interest and costs (considered further below).**

### Other Issues and Arguments

109. Strictly speaking, the admission disposes of the entirety of the case. However, the Tribunal addresses the other arguments put by the Parties. First, as these issues have been placed before the Tribunal, they shall be dealt with (even if no longer strictly needed). Second, and crucially, the other issues themselves fortify the Tribunal in its primary conclusion that DeLorean had admitted the entirety of the Debt.

---

[83] Namely, the full Invoiced sum less the sum paid by DeLorean to defray its Debt to IDG.

## Projects A – D and F

### *The Parties' Positions*

*DeLorean's Submissions*

110.  DeLorean put IDG to strict proof of the sums claimed due in respect of Projects A – D and F and did not admit the sums claimed.[84]   DeLorean adopted a position of "non-admission", rather than denial as to sums claimed due under Projects A – D and F.

*IDG's Submissions*

111.  IDG's overarching argument was that IDG had delivered the contractually requisite work under Projects A – D and F, and raised invoices accordingly.  IDG argued that DeLorean had accepted the work under each of Projects A – D and F and/or had not contemporaneously disputed the work or invoices and was thus contractually bound to pay for the sums claimed[85].

112.  In addition to this proving IDG's case of the sums alleged due and owing under Projects A – D and F, IDG further argued that this also went to establishing the quantum of Debt admitted by DeLorean[86].

113.  IDG argued that the MPA provisions should be interpreted as follows[87]:

(i)  IDG was obliged to perform each Project and deliver each Deliverable in accordance with the relevant annex for that Project (Article 5.1)

(ii)  DeLorean would then have 10 business days ("the Inspection Period") to inspect the relevant Deliverable(s) and sign and Acceptance Report (Article 5.2)

(iii) DeLorean could refuse the Deliverable(s) within the Inspection Period but was required to give its reasons by written notice (Article 5.3), otherwise the Deliverables were deemed accepted (Article 5.4)

---

[84] Respondent Submissions on Quantum of Debt D§16
[85] Claimant Submissions on Quantum of Debt C (entire section)
[86] Claimant Submissions on Quantum of Debt C§12
[87] Claimant Submissions on Quantum of Debt C§18

31

(iv) At the delivery date, IDG and DeLorean were required to inspect the Product together at IDG's premises. At the end of this inspection, the Parties were required to fill out the Acceptance Report. If DeLorean failed to take part in the inspection for reasons not attributable to IDG, the Product would be deemed accepted (Article 7.3); and

(v) In consideration of the execution of each Project by IDG, DeLorean was required to pay to IDG the amounts set out in the relevant Annex upon submission of an invoice (Article 9.1).

114.    Therefore, on IDG's submission, Projects A through D and F all followed a similar structure. IDG's relevant argument on each of these Projects is summarized in short form below.

*Project A[88]*

115.    Project A related to the preparation and construction of six ¼ scale model vehicles. IDG issued the Project A Proposal to DeLorean on 22 February 2022[89].

116.    Clause 3 of the Statement of Work provided for an Acceptance Procedure for Project A, with a written acceptance procedure by DeLorean (Clause 3.5 of the Technical Agreement).

117.    Clause 4 of the Scope of Work stated:
*"With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay Supplier the amount of EURO 235,000 for performance of the Deliverables or the provision of the Products under this Statement of Work as follows "Per Annex 5 – Payment planning" ".*

118.    Annex 5 set out a payment plan for Project A, with the total overall amount payable to IDG by DeLorean for delivery of Project A being EURO 235,000.00.

---

[88] Claimant's Quantum of Debt Submissions Section C.3
[89] **Exhibit C-02**: Annex A to MPA

119.   On 19 March 2022, DeLorean issued a Conditional Notice to Proceed on Project A[90]. On 8 August 2022, Mr de Vries signed the Project A Proposal on behalf of DeLorean.[91]

120.   IDG delivered the First Project A Deliverable to DeLorean prior to delivering the six ¼ scale models on 1 August 2022. IDG maintained that DeLorean had inspected the models via video call with IDG on 1 August 2022 in accordance with Article 7.3 of the MPA.[92] Pursuant to Article 5.4, the Inspection Period would have expired 10 business days later.

121.   IDG delivered all six models to Pebble Beach in California on 4 August 2022, prior to the Concours d'Elegance Event (on 21 August 2022).[93]

122.   On 8 August 2022, DeLorean signed the Acceptance Report in relation to all six models.[94]

*Invoices for Project A[95]*

123.   IDG raised the following invoices in respect of Project A:

| Date | Invoice Number | Value | Document Reference |
|---|---|---|---|
| 5 May 2022 (cover email) | 2022100817 | €47,000.00 (downpayment) | **Exhibit C -76, C-77** |
| 29 June 2022 | 2022101284 | € 94,000.00 (First Project A Deliverable) | **Exhibit C-78, C-22** |
| 4 July 2022 | 2022101469 | € 94,000.00 (Six scale models) | **Exhibit C – 79 and C-26** |

---

[90] Factual Exhibit **C14 [C-09]**
[91] **Exhibit C-02: Annex A to MPA**
[92] **Exhibit C-40**: Microsoft Teams Invite 1 August 2022; **Exhibit C-41**: List of attendees at Microsoft Teams meeting 1 August 2022
[93] **Exhibit C-42**: Transport Document dated 4 August 2022
[94] **Exhibit C-15**: Acceptance Report Project A
[95] Given the multiple referencing systems in issue for documents for the final hearing, it is noted that the references from this table tally with those in the Claimant's Submissions on the Quantum of Debt.

124. On 13 October 2022, DeLorean made a payment of EURO 514,128.53 in relation to sums owing to IDG, but did not indicate against which invoices this sum should be applied.[96] IDG stated that it had allocated EURO 47,000.00 of this sum (ie. the amount of the down payment) to the outstanding sum of EURO 235,000.00 due on Project A.

125. After receipt of the €514,128.53, IDG authorised release of the six scale models to DeLorean on 26 October 2022 (the models having been held at the Petersen Automotive museum in California after the Concours D'Elegance event pending payment).

126. Therefore, IDG claimed **EURO 188,000.00** as the balance due for Project A together with interest accruing therefore at 7% since date of invoices.

**Project B[97]**

127. Project B related to the development of the complete design and engineering activities and construction of three low speed show car models. Only the first show car (the Alpha V) was produced. The second and third vehicles under Project B were not provided and IDG had no claim in that regard.

128. IDG issued the Project B Proposal on 13 January 2022.[98]

129. The "Deliverables" under Project B were the results of styling, engineering and project management activities listed under clause 4.1 of the Technical Agreement B. The "Products" for Project B were as defined under Article 2.1 of the MPA ie. the three show cars.

130. The timeline under Project B provided that the Project B Deliverables would begin to be delivered from January 2022 and the first show car ie. the Alpha V would be delivered to DeLorean on 29 July 2022.

131. Clause 4 of the Scope of Work stated "*With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay Supplier the amount of EURO 3.600.000 for performance of the Deliverables or provision of the Projects under this Statement of Work as follows:*

---

[96] **Exhibit C-48**: Payment receipt dated 11 October 202
[97] Claimant's Quantum of Debt Submissions Section C4
[98] **Exhibit C-03**: Annex B to Master Project Agreement

*Per Annex 5 – Payment planning"*

132.    IDG alleged that as a result of amendments to Project B requested by DeLorean, the final cost of Project B increased in March 2022 to €3,964,000.00 (ie. an increase of €364,000.00)[99].

133.    According to the Payment Plan for Project B, DeLorean was required to make a down payment for Project B of €108,000.  DeLorean was then to pay further sums of €252,000.00, €216,000.00 and €1,225,600.00 following the delivery of the Project B Deliverables in accordance with the acceptance procedure under Article 5 and the payment procedure under Article 9 of the MPA.

134.    DeLorean was to pay a further €1,008,800, following the delivery of the Alpha V in accordance with the acceptance procedure under Article 5 and the payment procedure under Article 9 MPA.

135.    DeLorean authorised IDG to commence work on Project B by way of Conditional Notices to Proceed dated 14 January and 19 March 2022.  On 8 August 2022, Mr de Vries for DeLorean signed and accepted the Project B Proposal.

136.    IDG delivered the Project B Deliverables to DeLorean prior to delivering the Alpha V, on 1 August 2022.  IDG argued that the Inspection Period for the Project B Deliverables expired within ten business days of their delivery under Article 5.4 of the MPA. DeLorean not having refused the Deliverables during that time, the Project B Deliverables were deemed accepted and IDG argued it was entitled to raise the relevant invoice.

137.    On 1 August 2022, DeLorean inspected the Alpha V via video call[100], which started the ten business day inspection period for this product as per Article 5.4 of the MPA.

---

[99] **Exhibit C-80**: revised Project B Offer; **Exhibit C-81**: Revised Project B General Terms:  **Exhibit C-82**: Revised Project B Payment Plan; **Exhibit C-83**: Revised Project B Technical Agreement; **Exhibit C-84**: Email from IDG to DeLorean: **Exhibit C-85**: Email from DeLorean to IDG: **Exhibit C-10**: Conditional Notice to Proceed (Project B).
[100] **Exhibit C -40**:  Microsoft Teams Invite dated 1 August 2022;  **Exhibit C-51**:  List of attendees at Microsoft Teams Meeting on 1 August 2022

138.   IDG delivered the Alpha V to Pebble Beach on 4 August 2022.[101]

139.   DeLorean signed the Acceptance Report for the Alpha V on 8 August 2022[102] and then unveiled the Alpha V at the Concours D'Elegance event on 21 August 2022.[103]

*Invoices for Project B*

| Date | Invoice Number | Value | Document Reference |
|---|---|---|---|
| 14 February 2022 | 2022100134 | €108,000.00 (Down payment) | **Exhibit C-86 and 87** |
| 2 March 2022 | 2022100349 | €252,000.00 (Design Freeze phase of Project) | **Exhibit C-88** |
| 5 May 2022 | 2022100816 | €216,000.00 | **Exhibit C-76 and C-89** |
| 29 June 2022 | 2022101282 2022101283 | €1,255,600.00 (across both invoices) | **Exhibits C-20, C-21 and C-78** |
| 18 July 2022 | 2022101565[104] | €1,008,800.00 (Delivery of the Alpha V) | **Exhibits C-31, C-91** (Email cover) [This final invoice refers to multiple Projects and not just Project B. Previously invoiced figures would normally have been removed, but IDG's case was that |

---

[101] **Exhibit C-42**: Transport Document dated 4 August 2022
[102] **Exhibit C-15**: Acceptance Report Project A
[103] **Exhibit R-1**: CarExpert Report 23 August 2022
[104] During the early disposition application, the Tribunal queried as to whether this invoice related to Project A or Project B. The explanation provided above and on 7 June 2024 by IDG was that the invoice related to Project B.

| | | | this was overlooked in this instance.][105] |
|---|---|---|---|

140. IDG submitted that DeLorean did not dispute any of the Project B invoices prior to the commencement of the arbitration. On the contrary, DeLorean paid the first two invoices for Project B (2022100134 and 2022100349) on 17 February and 4 April 2022.

141. On 13 October 2022, DeLorean made a payment of €514,128.53 in relation to amounts owing on the Projects, without indicating which specific invoices it was paying.[106] IDG allocated €216,000.00 to the outstanding sum owing in relation to Project B, leaving a total of €2,234,400.00 owing under Project B.[107] IDG refers the amounts outstanding as relating to the Showcar Tooling Kick Off (€1,225,600) and the Alpha V (€1,088,800).

142. Therefore, IDG claimed **€2,234,400.0**0 as the sum outstanding on Project B together with interest thereon at 7% since date of invoices.

*Project C[108]*

143. Project C related to design, research and manufacturing of an exterior style hard model of an off-road GT Vehicle ("Off-road Model").

144. IDG issued the Project C Proposal to DeLorean on 17 March 2022[109].

145. The Deliverables under Project C were set out at Clauses 3.1to 3.3 of the Technical Agreement C, and were delivered to DeLorean in the form of data uploaded through an FTP Server. The Product, as defined under Article 2.1 MPA, for Project C was the exterior of the Off-road Model. The Deliverables under Project C had to be completed prior to the physical production of the Off-road Model.

---

[105] Claimant's Quantum of Debt Submissions §79
[106] **Exhibit C-48**: Payment receipt dated 11 October 2022
[107] Claimant's Quantum of Debt Submissions §84 and exhibits referred therein
[108] Claimant's Quantum of Debt Submissions Section C.5
[109] **Exhibit C-04**: Annex C to Master Project Agreement

146. According to the Project C timeline at Annex C-4, the Project C Deliverables would be completed between April and May 2022 and the exterior of the Off-road Model would be released to DeLorean in July 2022[110].

147. Clause 4 of the Scope of Work stated: "*With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay supplier the amount of Euro 390,000 for performance of the Deliverables or provision of the Products under this Statement of Works as follows*

    *" Per Annex 5 - Payment Planning"*

148. According to the Payment plan for Project C, the total amount payable to IDG by DeLorean for the delivery of Project C was €390,000.00. DeLorean was to make a down payment of €78,000 followed by two further branches of €78,000 against acceptance of specific Deliverables. There was then a final payment of €156,000 following the delivery of the exterior of the Off-road Model in accordance with the acceptance procedure under Article 5 of the MPA and the payment terms under article 9.2 of the MPA.

149. DeLorean did not issue IDG with a conditional notice to proceed for Project C.[111] Nevertheless, on 8 August 2022, Mr de Vries signed the Project C Proposal on behalf of DeLorean.[112]

150. IDG delivered the Project C Deliverables to DeLorean prior to the delivery of the Off-road Model on 1st August 2022. Upon the expiry of the contractual Inspection Periods the Project C Deliverables were deemed accepted and IDG argues that it was entitled to raise the relevant invoices.

151. DeLorean inspected the off-road model via video call with IDG on 1August 2022 in accordance with article 7.3 of the MPA[113]. The inspection period lapsed 10 business

---

[110] **Exhibit C-04**
[111] Claimant's Quantum of Debt Submissions §101
[112] Exhibit **C-04**
[113] **Exhibit C-40**: Microsoft Teams Invite dated 1 August 2022; **Exhibit C-41**: Attendee list Microsoft Teams Meeting 1 August 2022

days later pursuant to article 5.4 of them MPA. DeLorean had not rejected the Off-road model and IDG issued the relevant invoice.

152.　IDG delivered the Off-road Model on 4 August 2022[114].

153.　DeLorean signed the acceptance report in relation to the Off-road Model on 8 August 2022[115], and subsequently revealed the Off-road Model at the Concours D'Elegance event[116].

*Invoices for Project C*

| Date | Invoice Number | Value | Document Reference |
|---|---|---|---|
| 5 May 2022 | 2022100821 | €78,000.00 | Exhibit **C-93 and R-1** |
| 29 June 2022 | 2022101285 | €78,000.00 | Exhibits **C-78 and C-23** |
| 4 July 2022 | 2022101471 | € 78,000.00 | Exhibit **C-79 and C-27** |
| 18 July 2022 | 2022101563 | €156,000.00 | Exhibit **C-91 and C-29** |

154.　IDG submitted that DeLorean did not dispute any of the Project C invoices prior to commencement of this arbitration.

155.　On 13 October 2022, DeLorean made a payment of €514,128.53 in relation to the Projects, without indication as to which invoices this was to be allocated against. IDG allocated €78,000.00 of this amount to Project C, leaving a balance of EUR 312,000.00 owing for the Project.[117]

---

[114] **Exhibit C-92**: Off-road Transport Document
[115] **Exhibit C-15**: Acceptance Report
[116] **Exhibit R-1**: CarExpert Report 23 August 2022
[117] Claimant's Quantum of Debt Submissions §115 and documents cited therein

39

156.    IDG authorised the release of the Off-road Model on 26 October 2022[118] after receipt of the part payment.

157.    IDG therefore claims €**312,000.00** as the sum outstanding on Project C plus interest thereon at 7% from date of invoice.

*Project D*

158.    Project D related to the design research and manufacturing of an exterior style hard model of a shooting brake vehicle ("Shooting Brake Model").

159.    IDG issued the Project D Proposal to DeLorean on 4 April 2022.[119]

160.    The Deliverables under Project D, as listed at clauses 3.1 to 3.3 of Technical Agreement D, were delivered to DeLorean in the form of data uploaded to an FTP server. The final Deliverable was the Product under Project D, ie. the Shooting Brake Model. The Shooting Brake Model could only be physically produced after the prior completion of the Project D Deliverables.

161.    The Project D Deliverables were to be delivered between April and June 2022, and the Shooting Brake Model was to be released to DeLorean in July 2022.[120]

162.    Clause 4 of the Scope of Work stated: "*With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay Supplier the amount of EURO 330.000 for performance of the Deliverables or provision of the Projects under this Statement of Work as follows:*

*Per Annex 5 – Payment planning*".

163.    Thus, the total amount due to IDG by DeLorean for delivery of Project D was €330,000.00. DeLorean was to make a downpayment of € 66,000.00, followed by two tranches of €66,000.00 against Deliverables. Finally, DeLorean was to pay €132,000.00 following delivery of the Shooting Brake Model, in accordance with the

---

[118] **Exhibit C-50 and C-51**: Emails of 21 October 2022 and 26 October 2022
[119] **Exhibit C-05**: Annex D to the MPA
[120] **Exhibit C-05**: Annex D-4

acceptance procedure under Article 5 of the MPA and the payment terms under Article 9.2 of the MPA.[121]

164. DeLorean authorised IDG to commence work on Project D by email from Troy Beetz to Andrew Porta on 4 April 2022[122]. No Conditional Notice to Proceed was issued. On 8 August 2022, Mr de Vries signed the Project D Proposal on behalf of DeLorean.[123]

165. IDG delivered the Project C Deliverables to DeLorean prior to the delivery of the Shooting Brake Model on 1 August 2022. Upon the expiry of the contractual Inspection Periods the Project D Deliverables were deemed accepted and IDG argues that it was entitled to raise the relevant invoices.

166. DeLorean inspected the Shooting Brake Model via video call with IDG on 1 August 2022 in accordance with article 7.3 of the MPA[124]. The inspection period lapsed 10 business days later pursuant to article 5.4 of them MPA. DeLorean had not rejected the Shooting Brake Model and IDG issued the relevant invoice.

167. IDG delivered the Shooting Brake Model on 4 August 2022[125].

168. DeLorean signed the acceptance report in relation to the Shooting Brake Model on 8 August 2022[126], and subsequently revealed the Shooting Brake Model at the Concours D'Elegance event[127].

*Invoices for Project D*

| Date | Invoice Number | Value | Document Reference |
|---|---|---|---|
| 5 May 2022 | 2022100824 | €66,000.00 (Down payment) | Exhibit **C-95 and C-76** |

---

[121] **Exhibit C-05**: Annex D-5 to the MPA
[122] **Exhibit C-12**: Email between A Porta and T Beetz
[123] **Exhibit C-05**: Annex D to MPA
[124] **Exhibit C-40**: Microsoft Teams Invite dated 1 August 2022; **Exhibit C-41**: Attendee list Microsoft Teams Meeting 1 August 2022
[125] **Exhibit C-94**: Shooting Brake Transport Document
[126] **Exhibit C-15**: Acceptance Report
[127] **Exhibit R-1**: CarExpert Report 23 August 2022

| 29 June 2022 | 2022101292 | €66,000.00 (Design Freeze Deliverable) | Exhibits **C-78 and C-24** |
| 4 July 2022 | 2022101473 | €66,000.00 (CAS Freeze Deliverable) | Exhibit **C-79 and C-29** |
| 18 July 2022 | 2022101563 | €132,000.00 | Exhibit **C91 and C-29** |

169. IDG submitted that DeLorean did not dispute any of the Project D invoices prior to commencement of this arbitration.

170. On 8 April 2022, DeLorean paid the € 66,000.00 down payment.

171. IDG authorised the release of the Shooting Bake Model on 26 October 2022[128] after receipt of the part payment on 13 October 2022 (although none of this part payment was allocated to Project D Invoices).[129]

172. IDG therefore claims €**264,000.00** as the sum outstanding on Project D plus interest thereon at 7% from date of invoice.

*Project F[130]*

173. Project F related to technical assistance provided by IDG to DeLorean during the Concours d'Elegance event at Pebble Beach on 21 August 202, including provision of a team of 7 persons.  Project F did not involve design, engineering or construction.

174. IDG issued the Project F Proposal to DeLorean on 6 June 2022[131]. Clause 3 of the Project F Offer provided for an activities period between 16 and 22 August 2022.

---

[128] **Exhibit C-50 and C-51**: Emails of 21 October 2022 and 26 October 2022
[129] Claimant's Quantum of Debt Submissions §148
[130] Claimant's Quantum of Debt Submissions Section C.8
[131] Exhibit **C-07**:  Annex F to MPA

42

175.    Clause 4 of the Scope of Work stated: *With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay Supplier the amount of EURO 110.000 for performance of the Deliverables or provision of the Projects under this Statement of Work as follows:*

*Per Annex 5 – Payment planning".*

176.    According to Clause 4 of the Statement of Work and Clause 5.3 of the Project F Offer, the total amount payable by DeLorean to IDG for the delivery of Project F was EUR 110,000.00, being split into a down payment of €55,000.00 and a further payment of €55,000.00 following the end of Project F.

177.    Despite the Statement of Work referencing Deliverables and Product, Project F did not have a Deliverable or Product as contractually described. Therefore, IDG argued that the Article 5 MPA acceptance procedure did not apply and that IDG could issue invoices on completion of Project F ie. after providing technical assistance at Pebble Beach on 21 August 2022.[132]

178.    There was no Conditional Notice to Proceed for Project F, but Mr de Vries signed the Project F Proposal on behalf of DeLorean on 8 August 2022.[133]

179.    IDG submitted that seven technicians were arranged by them and attended the Pebble Beach Event on 21 August 2022, providing technical assistance to DeLorean. IDG demonstrated this by reference to photographic and video evidence.[134]

180.    On 4 July 2022, Troy Beetz of DeLorean emailed Andrea Porta of IDG requesting that IDG send the invoice for the technical team at Pebble Beach.[135]

181.    On 21 July 2022, IDG provided invoice number 2022101625 in the full amount of €110,000.00 for Project F[136]. IDG did not split the invoice as envisaged contractually. However, IDG argued that it became entitled to the full amount for Project F after the

---

[132] Claimant's Quantum of Debt Submissions §190
[133] **Exhibit C-07**: Annex F to MPA
[134] Exhibit **C-102, C-103 and C-104**: Photographs; Exhibit **C105**: Email from DeLorean to IDG, Youtube Video of Alpha V unveiling.
[135] **Exhibit C-100**: Email from DeLorean to IDG
[136] **Exhibit C-32**: Invoice

Pebble Beach Event, and in any event, no later than 30 days after the Pebble Beach Event (ie. 30 days after 21 August 2022) in accordance with Article 9.2 of the MPA.

182. IDG submits that DeLorean has not made any payment towards Project F.

183. IDG therefore claims €**110,000.00** as the sum outstanding on Project F. IDG's Submissions on Quantum of Debt do not specifically plead in the narrative an interest claim for Project F but the interest specific calculations adduced by IDG do contain a calculation for interest due on Project F, applying the same principles as under Projects A – D (namely at 7% from date of invoice).

184. Overall, on Projects A – D and F, IDG submitted that DeLorean had abandoned any defences previously put forward and that IDG had discharged the burden of proof. Therefore, IDG argued that the Tribunal was bound to accept its Submissions on the quantum of debt on Projects A – D and F.

*Discussion and Findings*

185. Given the factual finding of DeLorean's admission of the full quantum of the debt, there is strictly speaking no need to consider this issue further.

186. DeLorean put IDG to strict proof that IDG had properly incurred the debts claimed under Projects A-D and F. IDG discharged the burden of proof (were it necessary to make this finding, which it is not).

  (i) DeLorean signed Acceptance Reports for Projects A-D.  This provides overwhelmingly strong evidence that the work undertaken and invoiced under Projects A-D had been done and that the sums invoiced fell due and owing to IDG.

  (ii) Further, there was no evidence that DeLorean rejected any products or deliverables invoiced (and now claimed) under Projects A – D, within the contractual Inspection Period(s) (or at all).  Pursuant to the contractual scheme, absent a written rejection, the products and deliverables were deemed accepted. IDG would then be entitled to raise an invoice.

  (iii) DeLorean had abandoned its defences in respect of Projects A – D (and Project F) and had not adduced any counterclaim whatsoever in this regard.

44

(iv) Thus, as regards Projects A – D, IDG indisputably discharged the burden of proof and the invoiced sums it claimed fell due and owing.

(v) As regards Project F, there was no parallel written acceptance report. However, this was explained by the fact that personnel services had been provided rather than Products and Deliverables. The contractual Inspection Period, or an analogous period of time, had passed without a rejection having been raised by DeLorean. Indeed, if DeLorean had had a grounds for disputing the payment due for the services provided they would doubtless have raised this point in their evidence or argument. They did not. Therefore, again, IDG established on the balance of probabilities that the debt claimed under Project F was due and owing.

187. The arguments under Projects A-D and Project F have given further support and comfort to the Tribunal's finding as to the admission. DeLorean had accepted works under Projects A – D and F and was therefore liable to pay the invoices raised. DeLorean raised no contemporaneous objection. This is entirely consistent with a position in which DeLorean had admitted a substantial debt due and owing to IDG.

188. It is also consistent with the narrative put forward by IDG: namely that DeLorean was continuing a relationship with IDG (as per the evidence of Mr Marquart). This fits with the situation where DeLorean consistently approved Acceptance Reports for the work under Projects A – D (with no acceptance report being provided under Project F due to the different nature of the services provided).

189. It was notable that DeLorean adopted a "non-admission" as to the sums owing under Projects A-D and F, and instead put IDG to proof. DeLorean did not run an active defence, nor did it deny the position as put by IDG. It could not properly have done so, given the clear contemporaneous documentary evidence.

190. **Although it is not necessary to decide the point given the factual finding on the admission, the Tribunal would have found that IDG had proven that a debt due and owing to it in the sum of €3,108,000.00 in respect of Projects A – D and F, plus interest thereon (considered separately).**

45

## Project E

191.  Again, given the factual finding that DeLorean had admitted the entirety of the Debt, the Tribunal strictly does not need to consider Project E at all.  However, given the arguments made by the Parties, the Tribunal addresses these points.  This is no way detracts from the primary finding of DeLorean's admission of the full Debt.

192.  Project E was in a separate category from Projects A – D and F.  IDG admitted that it had not provided all the Deliverables due under Project E, but indicated that it stood willing and ready to do so on payment of sums owing. As all the Deliverables had not been provided, there was no written acceptance and the contractual Inspection Period could not be said to have elapsed.   As a result, both Parties approached Project E with a different analysis.

*IDG Submissions[137]*

193.  Project E related to "Engineering pre concept development services", in particular the engineering development of the Alpha V. This was a necessary step before its mass manufacture. There is therefore a link between Project E and Project B.

194.  IDG issued a Project E Proposal to DeLorean on 21 February 2022, which was then updated on 14 March, 29 March and 19 May 2022 as the scope of Project E evolved.[138]

195.  Ultimately, there were 11 "Deliverables" for Project E listed under section of the Technical Agreement E ("the Project E Deliverables").[139]   IDG was to provide DeLorean with "*data, technical direction and guidance for the major and critical areas of the vehicle*" on an ongoing basis as well as engineering and design deliverables.  The timeline for provision was set out in detail in Technical Agreement E.

196.  Clause 4 of the Statement of Work stated: "*With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay Supplier the amount of*

---

[137] Claimant's Quantum of Debt Submissions §152
[138] Claimant's Quantum of Debt Submissions§ 156
[139] **Exhibit C-006**: Annex E to Master Project Agreement

46

*EURO 950.000 for performance of the Deliverables or provision of the Projects under this Statement of Work as follows:*

*Per Annex 4 – Payment planning".*

197. The Payment Plan for Project E set out a down payment of EURO 47,500.00 followed by three further instalments of EURO 285,000.00, EURO 332,5000.00 and EURO 285,000.00. These instalments were labelled in the diagram showing the Payment Plan as "End of Month".

198. IDG thus argued that the invoices under Project E were not contingent on the delivery of particular Deliverables, but rather would be raised at the end of the first, second and third month following the commencement of Project E[140].

199. DeLorean issued the Conditional Notice to Proceed in respect of Project E on 24 March 2022.[141]

200. On 8 August 2022, Mr de Vries signed the Project E Proposal on behalf of DeLorean.[142]

201. IDG's case was that they delivered the Project E Deliverables as and when completed, between April and July 2022. However, IDG admitted that it had not delivered the entirety of the Project E Deliverables. IDG submitted that it had delivered 9 out of the 11 Project E Deliverables.[143]

202. IDG's argument (as further set out below) was that this did not prevent the sums invoiced falling due and owing and that IDG stood ready to deliver the remaining Deliverables upon receipt of payment by DeLorean.[144]

---

[140] Claimant's Quantum of Debt Submissions §164
[141] Exhibit **C-11**: Conditional Notice to Proceed (Project E)
[142] **Exhibit C-05**: Annex E to the MPA
[143] Claimant's Skeleton for Quantum of Debt Hearing §30 – 34; the dates and times on which under Project E were provided to DeLorean between April and July 2022 were set out in detail in a submission made by IDG in response to the Tribunal's order on document production dated 8 November 2024 [Bundle A/Tab 24]l see also WS Porta 2 §16-30 and 35; and Claimant's Reply Quantum of Debt Submissions §77-84
[144] Claimant's Quantum of Debt Submissions §168 - 169

47

*Invoices under Project E*

| Date | Invoice Number | Value | Document Reference |
|------|----------------|-------|--------------------|
| 5 May 2022 | 2022100705 | €47,500.00 (Down Payment) | **Exhibit C-97 and C-76** |
| 25 May 2022 | 202210102 | €285,000.00 (described by IDG as first month's payment) | **Exhibit C-98 and C-19** |
| 29 June 2022 | 2022101310 | €332,500.00 (described by IDG as second month's payment | **Exhibit C-78 and C-25** |
| 2 August 2022 | 2022101683 | €285,000.00 (described by IDG as third month's payment) | **Exhibit C-99 and C-33** |

203.    IDG contends that DeLorean did not dispute any of the Project E invoices prior to the arbitration.    However, IDG argued that DeLorean made no payments to defray the Project E invoices.

204.    Of the €514,128.53 paid by DeLorean on 13 October 2022, IDG allocated €173,128.53 to Project E.

205.    This left a balance of €776,871.47 claimed by IDG in relation to Project E (plus interest thereon).

206.    IDG's arguments to justify an entitlement to sums invoiced under Project E, despite no acceptance reports being signed were as follows.

207.    First, IDG was entitled to issue four separate invoices at monthly intervals, and payment due under these invoices was not contingent on the provision or acceptance of Project

48

E Deliverables. IDG argued that a proper understanding of the contractual terms did not require formal acceptance of Deliverables before IDG were entitled to raise an invoice (either generally or specifically in relation to Project E). IDG argued that properly construed Article 9 of the MPA made no connection between delivery and acceptance of Deliverables and IDG's right to raise invoices and be paid. IDG maintained that this was not undermined by Article 5 of the MPA, in particular Article 5.4 of the MPA. On the contrary, IDG asserted that Article 5.4 was a "pay now, argue later" clause. IDG argued that this was a well-known type of clause, and was in no way prejudicial to DeLorean.[145]

208.    IDG further argued that, in the specific context of Project E, Annex E-3 made no connection between delivery and acceptance of Deliverables and IDG's right to raise invoices and be paid. Further, the Project E payment plan was in a difference form from those under Projects A – D. Project E referenced "End of Month" payments, and the gantt chart for Project E showed no Deliverables due within the First Month, but nevertheless the End of Month payment was to fall due. This, IDG argued, strongly supported its contractual analysis of payments per month, rather than against Deliverables.[146]

209.    Second, IDG argued that it had delivered 9 out of 11 Deliverables, and said Deliverables were deemed accepted contractually and/or DeLorean was in breach itself by having failed to sign an Acceptance Report. IDG indicated that it would deliver the other Deliverables against payment or if ordered to do so by the Tribunal (which IDG indicated that it had no objection to). On this basis, IDG argued that it should receive full payment or alternatively, a payment to IDG in the amount that the Tribunal would see fit.[147]

210.    IDG further submitted that the missing deliverables were "*not crucial to the subsequent continuation of the development of the new AlphaV Vehicle*". IDG further argued that

---

[145] Claimant's Skeleton for the Quantum of Debt Hearing  §21 – 26, expanded in oral submissions
[146] Claimant's Skeleton for the Quantum of Debt Hearing §25, expanded in oral submissions
[147] Claimant's Skeleton for the Quantum of Debt Hearing §27  - 34, expanded in oral submissions

the missing deliverables were not a *"showstopper"* *"they were not so significant that they would have stopped the overall project progressing"*.[148]

211.    In the hearing, IDG further argued that the Tribunal could apply 82% of the invoiced value of Project E[149].

*DeLorean's Submissions*

212.    DeLorean did not admit that the initial downpayment of €47,500.00 was due and positively denied that any of the invoices issued in respect of Project E became due and owing[150].

213.    DeLorean argued that IDG was obliged to perform the work set out in the Project E Proposal, deliver the agreed Deliverables to DeLorean in accordance with the agreed timetable, and then upon acceptance of those, the invoices would become due and owing.[151]

214.    To support its position, DeLorean attacked IDG's contractual interpretation and proffered its own. DeLorean argued that there was no basis for distinguishing Project E from Project A – D . Instead Clause 4 of the Scope of Work should apply in the same way in Project E, and this clause envisaged that DeLorean pay for the performance of the Deliverables or provision of Products. DeLorean maintained that the "End of Month" references in the Payment Plan must be referable to the performance and acceptance of Deliverables as set out in Section 5 of the Statement of Work. This interpretation, DeLorean argued, avoided the possibility of IDG getting "money for nothing".   Only when the agreed Deliverables were delivered to and accepted by DeLorean in accordance with Article 5 of the MPA would the agreed sums then become due and owing.   As DeLorean did not sign any Acceptance Reports for Project E, no sums became due and owing.[152]

---

[148] Transcript Day 2/p50/lines 5 - 12

[149] Transcript Day 2/p10/lines 19-23

[150] Respondent's Quantum of Debt Submissions §17; further expanded in oral submissions in the hearing

[151] Respondent's Quantum of Debt Submissions §19; further expanded in oral submissions in the hearing

[152] Respondent's Quantum of Debt Submissions §31 – 32; further expanded in oral submissions in the hearing

215. DeLorean maintained that IDG had not evidenced the delivery of the Deliverables under Project E[153].

216. DeLorean argued that it was not open to the Tribunal to exercise its discretion to award a sum in relation to Project E and that the Tribunal also could not award 82% of the invoiced value of Project E. DeLorean argued that IDG was asking the Tribunal to decide the matter *ex aequo et bono* or in a manner similar thereto[154], which is prohibited by Article 31.3 of the ICDR Rules. Further, DeLorean argued that the 82% figure was introduced inappropriately by IDG at the hearing, at a point when the Parties had agreed (and the Tribunal had ordered) that new substantive arguments should not be made.

*Discussion and findings*

217. Given the factual finding that DeLorean admitted the entirety of the Debt, it is again not strictly necessary to engage with the arguments surrounding Project E. Discussion of Project E in no way detracts from the factual finding. Indeed, for the reasons set out below, it further supports the Tribunal's primary conclusion as to the admission of the Debt.

218. First, as regards the initial downpayment, DeLorean adopted a position of non-admittance and advanced no clear case as to why it would not be liable for said downpayment. Its arguments as to acceptance of Deliverables could not apply to this particular aspect of Project E invoicing. Given the non-admittance rather than denial and lack of clear defence, DeLorean were liable for the downpayment under Project E of €47,500.00.

219. Second, as to whether IDG had proved it had delivered any Deliverables under Project E, IDG provided significant detail and evidence as to the delivery of 9 out of the 11 Deliverables, both via WS 2 Porta and also via the table of dates and times of delivery of Project E Deliverables produced by IDG in response to the Tribunal's document production order of 8 November 2024. That IDG had delivered 9 out of the 11

---

[153] Respondent's Quantum of Debt Submissions §32; also WS Marquart §12
[154] Transcript Day 2/p48 - 49

51

Deliverables was not disputed by DeLorean in the hearing[155], but rather DeLorean contended that IDG had not submitted evidence "to demonstrate the quantity that it claims related to these nine deliverables"[156].

220.    Thus, the issue between the Parties was ultimately whether IDG were entitled to full payment under Project E. The factual admission by DeLorean of the entire Debt establishes that IDG were so entitled. However, the contractual construction arguments also favour IDG's interpretation. The contractual construction arguments also made it unnecessary for IDG to prove figures related to each Deliverable under Project E, as opposed to figures based on invoices per month (as claimed by IDG).

221.    IDG's construction of Article 9 of the MPA read together with Article 5 of the MPA, in particular Article 5.4 of the MPA, was compelling. In particular, the most likely commercial reading of Article 5.4 was that it was *"pay now, argue later"* clause. This then read harmoniously with the different payment structure as set out for Project E.

222.    The argument that this would lead IDG to be paid to do nothing could be and was refuted. The gantt chart for Project E itself showed that no Deliverables were expected in the first Month. Therefore, it could be concluded that the Project E payment structure did not work on the basis of payment against acceptance of Deliverables, but rather on a monthly invoicing basis. This did not mean DeLorean was unprotected: they could have raised their own claim and/or sought appropriate relief if IDG had failed to provide Deliverables in accordance with the Project E plan. However, they did not do so.

223.    As Project E proceeded on a monthly invoicing basis, the invoices have fallen due and owing despite the existence of two outstanding deliverables. IDG has indicated that it is willing to provide these Deliverables, and is open to an order from the Tribunal for them to be so provided after receipt of payment from DeLorean.

224.    In light of this, there is no need to determine whether the Tribunal can exercise its discretion to award a sum less than the invoiced sum for Project E. However, if it had

---

[155] Insofar as WS Marquart §12 (cited in written submissions) could be referred as indicating that DeLorean had not received Deliverables under Project E, it could also be understood as referring only to the "final deliverables" (the very words used by Mr Marquart) which could equally refer to the last two missing Deliverables.

[156] Transcript Day 2/p53/lines 18 - 23

52

been necessary to decide the point, the Tribunal would have agreed with DeLorean that the exercise of discretion was within either the letter or the spirit of the approach prohibited by Article 31.3 of the ICDR Rules. Further, the 82% figure as suggested by IDG at the hearing came too late procedurally and the Tribunal would have been, in any event, unable to determine whether 82% was even remotely appropriate (it assumed that all Deliverables were equally valuable: an assumption which was wholly untested and unevidenced). However, the Tribunal did not need to decide these points given its decision as a whole.

225.    That the invoices raised under Project E also fell due and owing, as a matter of contractual construction, further (though independently) supports the Tribunal's initial factual finding that DeLorean had admitted the entirety of the Debt.

**Conclusion on the Principal Issue**

226.    The Tribunal finds as a matter of fact that DeLorean admitted the entire Debt owing to IDG. DeLorean is therefore liable to pay IDG €3,885,271.47 in satisfaction of said debt, exclusive of interest and costs.

227.    IDG is to deliver up to DeLorean the Deliverables not yet delivered under Project E within 14 days from date of receipt of the payment of €3,885,271.47 from DeLorean.

**Interest**

228.    Pursuant to Article 34.4 of the ICDR Rules and section 49 of the English Arbitration Act 1996, the Tribunal has the power to award pre-award and post-award interest on the Debt. Section 49 provides that the parties are free to agree on the scope of the Tribunal's power to award interest. Article 34.4 provides that in award interest the Tribunal should *"tak[e] into consideration the contract and applicable laws"*. There is no dispute between the Parties in this regard.

53

229.    By Article 9.2 of the MPA, the parties agreed that DeLorean is required to pay interest at a rate of 7% per annum on starting from the 31st day after the date of the invoice until satisfaction.

230.    IDG therefore claims interest on the Debt pursuant to Article 9.2 of the MPA· IDG sought as its primary measure interest at the contractual rate compounded monthly, and stressed orally that the Tribunal had a discretion to award compound interest under Article 34.4 ICDR Rules.[157]

231.    DeLorean denied that the principal sums were due, but accepted that if any sums were to be found due, then the contractual rate should be applied. However, DeLorean stated that the MPA provided for interest at 7% per annum with no mention of compounding.

232.    Neither party made any argument as to the application of different pre and post Award interest rates, and IDG's submissions referred to interest continuing at the contractual rate until the date of payment.

233.    The Tribunal agrees with DeLorean that as the contract does not mention compounding, it would be inappropriate for the Tribunal to apply a discretion and introduce compounding when this is not mentioned in the parties' agreement.

234.    **The Tribunal therefore finds that DeLorean is required to pay interest at a rate of 7% per annum starting from the 31st day after the date of the invoice until date of payment Interest is to be calculated by reference to each individual invoice, as per the simple interest calculation table adduced by IDG.** On this basis, the interest

---

[157] Transcript Day 2/page 41/lines 15 - 19

54

as of the hearing date of 22 January 2025 was €679,968.39. This calculation must then continue on until date of payment by DeLorean.

## Costs

235.    Both Parties served Costs Submissions on 4 March 2025. The Parties had agreed that there would only be one round of costs submissions with no reply. The principles governing the Tribunal's power to award costs are not controversial. Both the Arbitration Act 1996 and the ICDR Rules provide the Arbitral Tribunal with a discretion to award costs.

236.    Section 61(2) Arbitration Act provides that:

*"Unless the parties otherwise agree, the tribunal shall award costs on the general principle that costs should follow the event except where it appears to the tribunal that in the circumstances this is not appropriate in relation to the whole or part of the costs".*

237.    Section 49(4) Arbitration Act provides that the Tribunal may award simple or compound interest from the date of the award, including on any award as to costs:

238.    Article 37 of the ICDR Rules provides that the tribunal may allocate costs on the basis that the allocation is reasonable tacking into account the circumstances of the case.

239.    Other relevant articles under the ICDR Rules are articles 24(9) (allowing a tribunal to take account failure to comply with information exchange orders in costs) and 34(5) (allowing costs to compensate for misconduct of a party) and article 22(8) requiring the Parties to avoid unnecessary expense and delay.

*IDG's Submissions*

240.    IDG argued[158] that it should be awarded the entirety of its costs, namely £324,304.00 in legal costs, together with £56,770.32 in Arbitration Costs and £4,732.27 for disbursements (eg. Transcribers).

---

[158] Claimant Costs Submissions of 4 March 2025.

241.    IDG argued that it should be awarded the entirety of its legal costs:

(i) Its legal costs incurred were reasonable and proportionate, particularly in light of the total quantum of the claim[159].

(ii) IDG stressed certain aspects of DeLorean's conduct of its defence, which IDG considered had increased costs unnecessarily.[160] The Tribunal found that the defences raised during the Early Determination phase were manifestly hopeless or frivolous, and that DeLorean was undoubtedly liable to IDG for a debt (the quantum of which then remained to be determined).  After the Early Determination phase, the dispute between the Parties remained live. DeLorean purported to withdraw admissions made, and then did not pursue this line of argument at the quantum hearing. DeLorean also did not put a positive case about Projects A – D and F, but put IDG to strict proof thereof.

(iii) IDG considered that DeLorean had failed to comply with the document production phase and that the ICDR Rules justified a costs award reflecting this. [161]

(iv) IDG argued that, insofar as the Tribunal would find that DeLorean had admitted liability for the entire Debt, then the whole proceedings were a tactic in delaying the point at which DeLorean would have to pay IDG.[162]

242.    IDG also raised a history of Without Prejudice Save as to Costs correspondence. It is not necessary for the Tribunal to set out the history of the full correspondence, but in short form, there were clear attempts by IDG to reach an amicable settlement with DeLorean via WPSATC correspondence.  Of particular relevance, is that on 12 September 2024, IDG offered to settle the entire dispute (inclusive of interest and costs) for €3,305,097.06.  Therefore, IDG argued that, should any award in its favour ultimately exceed this figure, IDG should be awarded the entirety of its costs[163].

---

[159] Claimant's Costs Submissions 4 March 2025 §17
[160] Claimant's Costs Submissions 4 March 2025 §18
[161] Claimant's Costs Submissions 4 March 2025 §18
[162] Claimant's Costs Submissions 4 March 2025 §18
[163] Claimant's Costs Submissions 4 March 2025 §34

56

243. IDG also sought the entirety of the arbitration costs paid, including those that it had paid on Delorean's behalf.[164]

244. IDG also claimed transcription fees and a modest sum for courier costs. IDG noted that PO2 §58 had required the Parties to split the transcription costs equally in first instance, but DeLorean had not done so and IDG were obliged to cover all the costs.

245. IDG produced supporting exhibits for its claims for legal costs, arbitration costs and disbursements.

246. IDG further claimed interest on costs, as can be awarded pursuant to s49(4) Arbitration Act 1996. IDG sought it at the same rate as applied to the Debt, namely 7% per annum compounded monthly, on the basis that this was the contractual rate (IDG having argued that interest could be compounded under the Contract). IDG claimed interest up to the actual date of payment (and in its calculations up to date of hearing) had allowed for 2 additional days to reflect time taken for bank transfers).

*DeLorean's Submissions*

247. DeLorean submitted that IDG had still not unambiguously proved its entitlement to the principal sums claimed[165]. Further, DeLorean argued that IDG had made a procedural miscalculation in bringing its Early Determination application because the application, in the terms that it was put, had not fully succeeded. DeLorean denied that IDG had produced any new evidence in its later submissions to further substantiate the amounts claimed.[166]

248. DeLorean argued that IDG should cover its costs in the arbitration and that for IDG to seek DeLorean to pay its costs would be an act of bad faith[167].

249. In the alternative, DeLorean argued that each party should bear their own costs.[168]

250. DeLorean itself had incurred costs of USD $184,187.10.

---

[164] Claimant's Cost Submissions 4 March 2025 §21 - 24
[165] Respondent's Costs Submissions 4 March 2025 §2 - 6
[166] Respondent's Costs Submissions 4 March 2025 §2 - 6
[167] Respondent's Costs Submissions 4 March 2025 §5
[168] Respondent's Costs Submissions 4 March 2025 §18

*Discussion and Findings*

251.   IDG is the undoubted victor in this arbitration. It won the on primary point in the case – namely, whether DeLorean had admitted the debt. Even though not strictly necessary, it also won on its arguments on Projects A – D and F and discharged the burden of proof that DeLorean had put it too. IDG also prevailed on its main interpretative argument as regards Project E (the sub-arguments on which IDG failed were subsidiary and did not impact on the overall outcome at all).

252.   Given that IDG is the certain winner of the arbitration, there is no reason to depart from the standard English law position, as reflected in s61(2) Arbitration Act, that costs follow the event. This is in no way indicative of bad faith on IDG's part: on the contrary, it is the standard legal basis for costs in this English seat of arbitration.

253.   Both Parties made negative comments about the other side's conduct.  The Tribunal considers that:

(i)   After the ED application, there continued to be opportunities to settle actively pursued by IDG and its legal team. After the ED determination, DeLorean was well aware that it was liable for at least some part of the Debt.   IDG has exceeded its own settlement offer, made after the ED Determination but before it accrued a considerable percentage of overall costs post September 12 September 2024.  The run-up to the hearing was necessarily a costs heavy period.

(ii)  DeLorean did cause IDG to incur legal costs by withdrawing its admission (then reinstating them) and  putting IDG to strict proof on Projects A – D and F.

(iii) Further, IDG had plausible grounds to argue that DeLorean had not complied with the document production orders, whist IDG itself had incurred costs in complying with the order made against it.

(iv) It was also incorrect for DeLorean to assert that no new evidence was produced by DeLorean in respect of the Quantum Hearing. On the contrary, new contemporaneous documentary evidence, including as to the admissions by DeLorean, was put into play by IDG.

58

254.  The Tribunal did not consider that IDG's Early Determination application was a procedural miscalculation. On the contrary, after the outcome of the Early Determination, it might have been expected that the matter would be resolved amicably between the Parties. That it was not so resolved is, as the WPSATC correspondence shows, attributable to DeLorean who failed ultimately to accept an offer better than the outcome now achieved by their counterpart in the Final Award.  The Tribunal does acknowledge that the Early Determination application could perhaps have been differently presented as regards the invoices and the quantum claimed by IDG.

255.  The costs incurred by IDG are reasonable and proportionate to the overall sums claimed.

256.  **The Tribunal therefore orders that DeLorean pay IDG 90% of IDG's claimed legal costs, being £291,873.60**.

257.  **The Tribunal further orders that DeLorean do pay to IDG all the Arbitration Costs claimed by IDG, namely US$63,907.30.**

258.  **The Tribunal further orders that DeLorean do pay to IDG all the disbursements claimed by IDG, namely £4,732.27**.

259.  **As regards interest on the legal costs, arbitration costs and disbursements, the Tribunal orders that DeLorean do pay interest thereon at a rate of 7% per annum compounded monthly up to date of payment**. In this instance, unlike the claim on the principal of the Debt, the Tribunal is prepared to allow compounding. The contractual rate of 7% applies to contractual debts between the Parties, whereas the legal costs, arbitration costs and disbursements are not such a contractual debt.  Given that the interest rate claimed by IDG is less than the statutory rate which could be applied in England, the Tribunal is prepared to allow monthly compounding on these line items.

I THE UNDERSIGNED ARBITRATOR, ANGHARAD PARRY having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated 19 July 2022, being part of the MPA formally executed on said date, and having been duly sworn, and having duly heard the proofs and allegations of the parties, and having

carefully and conscientiously considered the submissions addressed to me do hereby, **AWARD**, as follows:

(i) **I AWARD, DECLARE AND ADJUDGE** that DeLorean Motor Company Inc is liable to pay forthwith to Italdesign Giugiaro SPA the sum of **€3,885,271.47** in satisfaction of the Debt owing from DeLorean Motor Company Inc to Italdesign Giuguiaro SPA.

(ii) **I AWARD, DECLARE AND ADJUDGE** that, after receipt of payment of the sum of **€3,885,271.47,** Italdesign Giugiaro SPA do transfer to DeLorean Motor Company Inc such Deliverables as remain outstanding under Project E.

(iii) **I AWARD, DECLARE AND ADJUDGE** that, in relation to the Debt referred above, DeLorean Motor Company Inc do pay interest to Italdesign Giugiaro SPA at a rate of 7% per annum (simple basis) starting from the 31st day after the date of the invoice until date of payment.

(iv) **I AWARD, DECLARE AND ADJUDGE** that DeLorean Motor Company Inc do pay forthwith to Italdesign Giugiaro SPA the sum of **£291,873.60** in respect of legal costs incurred by Italdesign Giugiaro SPA.

(v) **I AWARD, DECLARE AND ADJUDGE** that DeLorean Motor Company Inc do pay forthwith to Italdesign Giugiaro SPA the sum of **US$63,907.30** in respect of the arbitration costs. This amount represents the portion of fees and expenses in excess of the apportioned costs previously incurred by Italdesign Giugiaro SPA, given that the administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaled US$23,000.00 , and the compensation and expenses of the arbitrator totaled US$56,657.30.

(vi) **I AWARD, DECLARE AND ADJUDGE** that DeLorean Motor Company Inc do pay forthwith to Italdesign Giugiario SPA the sum of **£4,732.27** in respect of disbursements associated with the arbitration.

(vii) **I AWARD, DECLARE AND ADJUDGE** that all payments ordered under this Award as stipulated above be made by DeLorean Motor Company Inc to Italdesign Giugiaro SPA within 30 days from the transmittal of this Final Award to the Parties.

(viii) **I AWARD, DECLARE AND ADJUDGE** that DeLorean Motor Company Inc do pay interest to Italdesign Giugiaro SPA on the legal costs, arbitration costs and disbursements referred above, at a rate of 7% per annum compounded monthly up to date of payment

This Final Award is in full settlement of all claims submitted to this Arbitration.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in London, England.

Arbitrator Name: Angharad M Parry KC

Date  23 April 2025

61

I, Angharad M Parry KC, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.


23 April 2025
Date

*Angharad M Parry KC*
_____, Arbitrator

62