# EXHIBIT 2

# MASTER PROJECT AGREEMENT

**BETWEEN**

Italdesign Giugiaro S.p.A., a company duly organized and existing under the Laws of Italy with its registered office in Via San Quintino, 28, 10121, Torino and its main office at Via A. Grandi n. 25, 10024 Moncalieri (Torino), Italy (hereinafter "**IDG**")

**and**

DeLorean Motor Company, Inc., a company duly organized and existing under the Laws of Delaware with an office at 907 Billy Mitchell Blvd., Ste. 101, San Antonio, Texas 78226, United States of America (hereinafter "**DeLorean**")

IDG and DeLorean are jointly referred to as "**Parties**".

**Whereas**

a. IDG is a company engaged in the automotive sector providing, amongst other things, styling, design, engineering, prototyping and testing services;

b. DeLorean is an automotive company engaged in the design, development, and manufacturing of electric vehicles;

c. DeLorean wishes to entrust IDG with, and IDG wishes to perform  the design, engineering, development and construction of low speed show-car models, 1:4 scale models, a shooting brake model, an off-road model and the related engineering pre-concept phase;

d. IDG has commenced work pursuant to Conditional Notices-to-Proceed as detailed in Attachment 4;

e. The Parties have agreed to enter into this Agreement, subject to the terms and conditions set out herein.

**NOW, THEREFORE, IT IS AGREED AS FOLLOWS:**

## 1. RECITALS AND ANNEXES

1.1. Recitals and annexes form an integral part of this Agreement.

## 2. DEFINITIONS

2.1. In this Agreement the following terms have the following meanings:

| | |
|---|---|
| "Agreement" | means this agreement between DeLorean and IDG for the provision of the Projects and any documents incorporated hereto. |
| "Background Information" | means all knowledge and expertise including but not limited to calculation procedures, data, models, software, know-how, inventions, operation and |

|  | design know-how or other Intellectual Property Rights existing prior to the date of this Agreement which a Party and/or any controlling or controlled companies bring to bear or provide in the course of carrying out or supplying a Project, whether or not contained in documents or other materials, and whether or not in the public domain but not including common knowledge in the field in which the Project is provided. |
|---|---|
| "Business Day" | means a normal business day (Monday to Friday excluding national bank holidays). |
| "Change" | means any modification of deviation from or addition to the Deliverables, the Products and the Time Planning. |
| "Compensation" | means the compensation for a Project as set out in Article 9; |
| "Confidential Information" | means any information or data relating to each Party, including its controlling and controlled companies, its technology, research, business or affairs including, without limitation, this Agreement, the Compensation, the Projects, the Background Information and disclosed whether in writing, orally or by any other means to the other Party by that Party, or by a third party on that Party's behalf, and whether before or after the date of this Agreement. |
| "Deliverables" | the results of styling, engineering and project management activities which IDG has to supply to DeLorean for each Project in accordance with this Agreement and the applicable Annexes; for the sake of clarity, to the purpose of this Agreement the final Products of the Projects shall not be deemed as Deliverables. |
| "Force Majeure Event" | means any of the following if beyond the affected Party's reasonable control: act of God, riots or insurrections, acts of terrorism, war (whether declared or not), civil disturbance, governmental or parliamentary restrictions, prohibitions or enactments, import or export regulations and/or sanctions, diseases and pandemic, fire, flood or unavoidable accident. |
| "Intellectual Property Rights" | means intellectual property rights of any kind and rights of a like nature wherever and whenever arising and whether registered or unregistered and including, without limitation, any patents, copyright, registered designs, design rights, topographic rights, database rights and rights in Confidential Information, trademarks, trade names, including without limitation the name DeLorean, the name IDG or their respective service marks. |
| "Product" | means a show car or model to be delivered to DeLorean as the result of a Project. |

CONFIDENTIAL

| "Project" | means a mutually agreed development project undertaken by IDG under this Agreement for DeLorean. |
|---|---|
| "Project Manager" | means the individual identified by IDG to manage the provision of a Project under this Agreement and to liaise with DeLorean in respect of this Agreement. |
| "Time Planning" | means a Project's time plan set out in its Annex X-2. |

## 3. SCOPE

3.1. IDG shall provide the Products, and related services, in accordance with the mutually agreed written terms of each Project. The specifics of each Project will be duly documented and agreed upon by the Parties within the Annex 1 - Statement of Work which template is attached to this Agreement as Attachment 1, Annex 2 – Offer and Annex 3 - Technical Agreement, as well as within Annex 4 - Time Planning and Annex 5 - Payment Planning. Each Project will be identified by consecutive letters of the alphabet (A,B,C) and the Projects will be documented by the following Annexes (with X replaced by letter for the Project).

- Annex X-1: Statement of Work

- Annex X-2: Offer

- Annex X-3: Technical Agreement

- Annex X-4: Time Planning

- Annex X-5: Payment Planning

## 4. OBLIGATIONS OF THE PARTIES

4.1. IDG shall perform each Project using its best skill and care and in accordance with the best design practice.

4.2. The complete set of Deliverables to be provided by IDG, the technical requirements and the time schedule of each Project are detailed in the Technical Agreement (Annex X-3) and in the Time Planning (Annex X-4).

4.3. DeLorean shall provide all information necessary to IDG to perform each Project properly and timely.

## 5. ACCEPTANCE OF DELIVERABLES

5.1. IDG shall perform each Project and deliver the Deliverables in accordance to Annexes 1 - 4 for that Project. IDG shall not be held liable for delay in completion or delivery of the Deliverables if such delay is attributable to DeLorean and any of DeLorean's suppliers or business partners.

5.2. DeLorean shall (i) inspect the Deliverables within 10 (ten) Business Days after delivery by IDG (hereinafter referred to as "Inspection Period") and (ii) accept the Deliverables by signing the Acceptance Report (Attachment 3), provided that they comply with this Agreement.

5.3. Within the Inspection Period, DeLorean may refuse the Deliverables if they do not comply with this Agreement, provided that it shall give reason for such refusal by written notice.

CONFIDENTIAL

5.4. Once the Inspection Period expires, the Deliverables shall be deemed as accepted and IDG shall be entitled to issue to DeLorean the relevant invoice.

5.5. It is understood that the Deliverables and the related Intellectual Property Rights remain the property of Italdesign until Delorean has made full payment of the amounts set forth in the relevant Annexes X-5.

## 6. CHANGE MANAGEMENT

6.1 DeLorean may demand, in writing, Changes and IDG shall undertake commercially reasonable efforts to comply (subject to the processes set forth in this Article 6). IDG shall inform DeLorean if it is of the opinion that any Changes are necessary or recommended and may propose Changes to DeLorean (and, for the avoidance of doubt, this shall not include any variations to the terms and conditions of this Agreement).

6.2 In either of the cases in Article 6.1, IDG, acting in good faith, shall submit, as soon as possible upon receiving DeLorean's Change demand or its discovery of the necessity for a Change (as the case may be), a cost estimate as to any additional costs or cost reductions together with information about the impact on a Project (in particular on the Project scope and Time Planning), which are caused by the proposed Changes (the "Impact Estimates").

6.3 When the Parties have agreed on the Impact Estimates, DeLorean shall prepare, unless otherwise agreed between the Parties, a draft change order specifying in detail the exact changes to be made in connection with the Changes (the "Change Order") (Attachment 2) and the Change Order shall be signed by IDG and sent to DeLorean for signature. Signature of the Change Order by the Parties will constitute an amendment to this Agreement only to the extent set out in the Change Order. Unless otherwise agreed, any adjustment in respect of a Change pursuant to which a Change Order is signed shall take effect from the date set out in the Change Order.

6.4 Until such time as a Change Order is signed by both Parties in accordance with the procedures in Article 6.3, each Party shall continue to perform its obligations under this Agreement as if the Change had not been proposed. Any discussions which may take place between the Parties in connection with a proposed Change before the relevant Change Order is signed shall be without prejudice to the rights of either Party.

## 7. DELIVERY OF THE PRODUCTS

7.1 The Products and any parts and/or components thereof shall be delivered within the delivery dates set out in Annex X-4 Free Carrier At (FCA) IDG premises in Moncalieri, provided however that the loading of the Product on the means of transportation shall be made by DeLorean.

Without prejudice to any support that IDG may provide to DeLorean in the logistics of the Products, any export from Italy and import to any other country shall be done at DeLorean's own risk and expense.

DeLorean shall take responsibility for compliance with any and all regulations relating to the export, import and/or use of the Products.

7.2 IDG shall notify DeLorean that the Product is ready for delivery 5 (five) calendar days before the delivery date.

CONFIDENTIAL

7.3 At the delivery date, IDG and DeLorean, or a third party appointed as its proxy, shall inspect together the Product at IDG's premises. In case DeLorean or its proxy is prevented for any reason from inspecting the Product in presence, the inspection shall be organized remotely. At the end of the inspection the Parties shall fill out and sign the Acceptance Report as set out in Attachment 3 and the Product shall be available for loading on transportation means.

Should DeLorean fail to take part to the inspection for any reasons not attributable to IDG, the Product shall be deemed as accepted as from the date of notification by IDG that the Product is ready for delivery.

7.4 DeLorean shall export the Products outside the EU within sixty (60) days from balance invoice issuance that shall be deemed as date of delivery.

Should DeLorean fail to make export operation from EU within the term set forth above, DeLorean shall be obliged to pay IDG (i) the relevant Italian V.A.T. to be calculated at the rate of 22% on the total value of the Product, as well as (ii) any amount (such as, but not limited to, fines and penalties) that Italdesign shall be required to pay as a consequence of DeLorean's failure to provide the above-Export Documents. As an alternative to point (i) above, IDG shall be entitled at its own discretion to scrap the Product.

7.5 In the event that DeLorean delays the collection of the Product for any reason, IDG shall be entitled to debit to DeLorean reasonable costs for custody of the Product, without being liable for whatever reasons for custody of the Product.

7.6 It is understood that the Products and the related Intellectual Property Rights remain the property of Italdesign, until Delorean has made full payment of the amounts set forth in the relevant Annexes X-5.

## 8. TRAVEL

8.1 The Parties acknowledge that no travels of IDG personnel are included within the Projects. In the event DeLorean requires IDG personnel to travel to its facilities or elsewhere, terms and conditions of travels shall be (i) agreed upon by the Parties, (ii) reimbursed by Delorean upon relevant invoice and (iii) in compliance with IDG's corporate travel procedures, as amended from time to time.

## 9. COMPENSATION AND TERMS OF PAYMENT

9.1 In consideration of the execution of each Project by IDG, DeLorean shall pay IDG the amount set forth in the Annex X-5 for that Project (hereinafter "Compensation"), upon submission of proper invoice as per Article 9.2 below.

As DeLorean shall export the Products outside European Union, IDG shall issue the relevant invoice related to the Products without V.A.T.

In addition, the Compensation under this Agreement does not include any other taxes, levies, imposts, duties, charges or withholdings of any nature ("Taxes") arising out of any transaction contemplated by this Agreement and imposed against IDG and/or DeLorean by any taxing authority. Without prejudice to the

above, both Parties shall be responsible for their own applicable taxes as required by applicable laws and rules in force.

In case of Changes, entailing Compensation revision, IDG shall be entitled to be compensated accordingly.

9.2 All payments from DeLorean to IDG are due within 30 (thirty) calendar days as from IDG invoicing date and shall be paid in Euro. Notwithstanding the foregoing, the Parties agreed that the invoice balance of the Product shall be paid at sight and in any case within 5 (five) days before date of delivery.

Payments shall be effected through wire transfer to the following bank account:

BANCA NAZIONALE DEL LAVORO S.p.A., BNPP Group, Agency no. 4
IBAN: IT67O0100501004000000012040
SWIFT/BIC Code: BNLIITRRXXX.

Should DeLorean fail to settle in party or wholly any undisputed payment within 30 calendar days, IDG will charge interests for delayed payment at a rate of 7% per year, to be applied to the relevant delay period, starting on the 31st day from the invoice date, provided however that in case DeLorean fails to settle the payment of the undisputed invoice within 40 calendar days, IDG shall be entitled to suspend and/or terminate at its own decision the applicable Project.

9.3 All other costs and expenses, such but not limited to spare and replacement parts, equipment and materials if any, shipping, freight, packaging, transport of the Product and/or its components are not included in the Compensation and shall be invoiced separately.

9.4 Unless the Parties otherwise agree in an amendment executed in accordance with Article 6 of this Agreement, DeLorean is not responsible for any additional fees, costs, or expenses of any type to IDG other than the specific fees in Annex X-3.

## 10. TAXES

10.1 All payments to be made under this Agreement shall be made free and clear of and without deduction for or on account of any tax, duty, levy, stamp, or custom duty, unless DeLorean is required to make any deduction or withholding for or on account of tax or otherwise from any payment to IDG under this Agreement (a "Tax Deduction").

10.2 If DeLorean is required by any law or regulation to make a Tax Deduction, within thirty (30) days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, DeLorean shall deliver to IDG a copy of any official receipt or receipts issued by the relevant tax authority evidencing that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant tax authority.

## 11. GENERAL WARRANTIES AND UNDERTAKINGS

11.1 Each of the Parties warrants to the other that it has full power and authority to enter into and perform this Agreement and that its entry into and performance under the terms of this Agreement will not infringe the rights of any third party or cause it to be in breach of any obligations to a third party.

CONFIDENTIAL

11.2 IDG warrants that it shall perform its obligations hereunder in accordance with the highest level of care, skill and diligence exercised by a skilled and competent person experienced and skilled in the development, styling manufacture, engineering and supply of the Deliverables and Products and in a good workmanlike manner using best quality materials, techniques, procedures and practices (including manufacturing practices).

11.3 IDG warrants that the Product is of sound and workmanlike construction in accordance to the technical requirements and specifications set forth in Annexes X-1, 2, 3, suitable for exposures and drivable within the limit set forth in Annex X-1, 2, 3 and guaranteed for a period of 3 (three) months as from the date of delivery of the Product or the date of notification by IDG that the Product is ready for delivery, whichever occurs first. The warranties in this Agreement are exclusive and in lieu of any other warranty, whether written, oral or implied. In case of hidden defects which could not be discovered by reasonable inspection at the date of the inspection of the Product, DeLorean shall made claims within 10 (ten) calendar days following the discovery, and shall be deemed waived if not made within the applicable period. DeLorean understands that the warranty is expressly limited to the repair or replacement, in IDG's sole discretion, of parts which are defective.

11.4 IDG warrants that it has all applicable permits and licenses required in connection with its obligations under this Agreement (and which will not include any permits or licenses DeLorean is obligated to obtain under Article 7).

11.5 IDG has not provided any untrue statement of a material fact in connection with a Project or this Agreement, or omitted any material fact necessary to make an IDG statement in connection with a Project or this Agreement not misleading.


## 12. LIABILITY

12.1 Except as excluded under clauses (a) –(c) below, notwithstanding any other provision in this Agreement, neither Party nor its agents, or its subcontractors shall be liable to the other Party, its agents and subcontractors, for any consequential losses (including loss of profit or revenues, loss of goodwill or reputation, or loss of opportunity), arising out of any performance of this Agreement, regardless of whether such losses or damages are based on tort, warranty, or any other legal theory, even if the Party is advised of the possibility of such losses or damages.

Nothing in this Agreement shall exclude or limit a Party's liabilities for:

a)  death or personal injury caused by that Party's negligence; or

b)  that Party's liability for gross negligence, willful misconduct, fraud or fraudulent misrepresentation; or

c)  any other liability that cannot be excluded by law.

Except as excluded under clauses (a) –(c) above, and notwithstanding any other provision in this Agreement, the total liability of each Party under this Agreement for any and all cumulated claims, whether based on the Agreement, tort (including negligence) or otherwise, resulting from each Party`s breach of its

obligations under this Agreement, shall not exceed 100% (one hundred per cent) of the total of Compensation.

## 13. INDEMNITY

13.1 Within the limits set forth in Article 12 above, each Party (the "Indemnifying Party") shall defend, indemnify and hold harmless the other Party and its employees, customers or agents (the "Indemnified Parties") from and against any and all damages, costs, expenses (including reasonable attorney fees), and liabilities awarded in any action brought against an Indemnified Party, arising out of any gross negligence, willful misconduct or breach of obligation under this Agreement by the Indemnifying Party or its agents. The Indemnified Party shall (a) promptly notify the Indemnifying Party in writing of the claim; (b) reasonably co-operate with and assist the Indemnifying Party in defending the claim at its expense; and (c) gives the Indemnifying Party sole authority to control or settle the claim.

## 14. MARKETING AND COMMUNICATION

14.1 The Parties agree to conduct promotional activities related to the Projects. Each Party shall be responsible for all advertising costs related to the activities performed by the respective Party. The activities and material to support sales, trade shows, meetings to present the Projects and/or the Products shall be agreed between IDG and DeLorean. In any case, each Party shall be responsible for keeping the other Party fully informed on promotional activities so as to ensure that the reputation and style of their respective trademarks are protected.

14.2 Any communication implying the use of the respective trademarks or company names of a Party on any mean of communication, such as but not limited to flyers, brochures, print ads, commercials, social networks postings, participation at trade shows and events shall have to be previously agreed by that Party.

## 15. INTELLECTUAL AND PROPERTY RIGHTS

15.1 All Intellectual Property Rights owned by the Parties on or prior to the date of signature of this Agreement ("Background IPR"), used or applied pursuant to this Agreement, shall remain the property of the party who owned such intellectual property rights on or prior to the signature of the Agreement.

15.2 In no case this Agreement shall constitute assignment and/or transfer to one Party (including but not limited to, by way of sublicense) of other Party's Background IPR. Any assignment of Background IPR from one Party to the other Party shall be subject of a separate agreement.

15.3 All Intellectual Property Rights created, developed or produced in occasion of the fulfillment of the scope of this Agreement and/or a Project by or on behalf of DeLorean in providing the Deliverables or Products ("Foreground IPR") shall be owned by DeLorean and IDG hereby irrevocably and unconditionally assigns all such Foreground IPR to DeLorean.

## 16. CONFIDENTIALITY

CONFIDENTIAL

16.1 Any exchange of information contemplated under this Agreement shall be governed by the confidentiality agreement signed between the Parties on May 27th, 2022 (the "NDA").

## 17. ASSIGNMENT

17.1 Neither Party may assign this Agreement nor any of the rights or duties hereof in whole or in part without the express prior written consent of the other Party. Any attempted assignment in violation of this Article 17.1 is void.

## 18. TERM AND TERMINATION

18.1 This Agreement will commence on the date hereof and will continue in full force and effect until the completion of all Projects (the "Term"), unless earlier terminated in accordance with the terms of this Agreement.

18.2 Each of the Parties may terminate this Agreement or any Project at any time by giving the other Party at least thirty (30) calendar days' advance written notice. Upon a termination for convenience, each Party will remain liable for its obligations under this agreement. If DeLorean terminates for convenience this Agreement in accordance with the provisions of this Article 18.2, DeLorean will remain liable for and shall pay to IDG, (a) the related price for all the Deliverables performed up until the date of termination of this Agreement, (b) all the cost and expenses incurred due to the earlier termination of this Agreement plus (c) an amount equal to twenty per cent (20%) of the Price for the Deliverables still to be performed at the date of termination.

18.3 In addition to any other rights or remedies DeLorean or IDG may have at law, a party not in default under this Agreement (the "Non-Defaulting Party") may terminate this Agreement or a Project by giving written notice to the other party (the "Defaulting Party") of the Non-Defaulting Party's intention to terminate this Agreement or the Project upon the occurrence of either or both of the following events:

a) a material breach by the Defaulting Party of any of its representations, warranties or obligations hereunder, or

b) the Defaulting Party becoming subject to an insolvency or bankruptcy proceeding.

Such notice will identify a date for termination of this Agreement, which date will not be sooner than fifteen (15) Business Days after receipt of such notice by the Defaulting Party ("Termination Date"). If the event on which the notice is based is not cured prior to the Termination Date, then this Agreement will terminate on the Termination Date.

If DeLorean terminates this Agreement in accordance with the provisions of this Article 18.3, subject to deduction for damages incurred by DeLorean as a result of IDG's breach, DeLorean will remain liable for and shall pay to IDG, (a) the related price for all the Deliverables performed up until the date of termination of this Agreement and (b) all the cost and expenses incurred due to the earlier termination of this Agreement.

18.4 Upon termination of this Agreement or any Project, IDG shall immediately deliver to DeLorean all copies of documents, records, or other materials relating to the services performed or containing

CONFIDENTIAL

Confidential Information, including all media, documentation, or other materials such as notes, drafts, and sketches, along with a written list of all uncompleted services, specifically identifying their status. IDG shall also cooperate reasonably with the efforts by DeLorean, or any other party on DeLorean's behalf, to complete any services and to provide for an orderly transition.

18.5 Articles 1, 2, 11, 12, 13, 14.2, 15, 16, 17, 18, 19, 20, and 21 will survive any termination of this Agreement.

## 19. CLAUSE OF SUSTAINABILITY

19.1 Italdesign respects and requires its business partners the compliance with the requirements of sustainability.

In particular, Italdesign requires its trading partners the compliance with the principles of legality, integrity, fairness and transparency in relation to the issues relating to environmental protection (energy saving, environmentally friendly, waste disposal and recycling), to the workers rights (freedom of association, health and safety of workers, respect of working hours, equal opportunities, prohibition of child labor exploitation), to transparency commercial transactions (prevention of conflicts of interest, corruption and money laundering, competition, compliance with legislation import/export of goods and services).

The business partner acknowledges that its failure to comply with the requirements of sustainability constitute a serious breach to this Agreement and, therefore, Italdesign shall have the right to terminate at any time and with immediate effect its business relationship.

## 20. CODE OF CONDUCT

20.1 IDG has adopted and complies with principles set out in the Code of Conduct available on the website www.italdesign.it.

During the business relationship, Italdesign requires its business partner to comply with the principles set out in the Code of Conduct, which incorporates the principles of the VW Group. Should the business partner infringe such principles, Italdesign shall be entitled to (i) terminate at any time and with immediate effect its business relationship and (ii) take the relevant action in order to protect its own interests, without prejudice to any further damages.

## 21. FORCE MAJEURE

21.1 Neither Party ("Affected Party") will be liable to the other ("Non-Affected Party") for failure to perform any part of this Agreement if such failure results from a Force Majeure Event. Upon the occurrence of any Force Majeure Event which results in, or will result in, delay or failure to perform according to the terms of this Agreement, the Affected Party will promptly give notice to the Non-Affected Party of such occurrence and the effect and/or anticipated effect of such occurrence. The Affected Party will use its reasonable efforts to minimize disruptions in its performance and to resume performance of its obligations under this Agreement as soon as practical.

CONFIDENTIAL

## 22. GENERAL

22.1 This Agreement, the Attachments attached hereto (including the Projects) embody the entire understanding of the Parties in respect of the provision of the Projects and related Deliverables and Products by IDG and all and any prior statements, undertakings, letters, authorizations, notices-to-proceed, documents or promises whether written or oral, express or implied made by either Party shall have neither force nor effect. No provision of this Agreement may be waived, altered, or amended except by a writing signed by the Parties that specifically identifies the Article of this Agreement to be waived, altered or amended.

22.2 If any of the provisions of this Agreement is found by any Court, arbitrator or other competent authority to be void or otherwise unenforceable either in whole or in part such provision or part thereof shall be deleted and the remaining Articles shall apply.

22.3 Nothing in this Agreement shall create a partnership or joint venture between the Parties hereto and, save as expressly provided in this Agreement, neither Party shall enter into or have authority to enter into any engagement or make any representations or give any warranty either express or implied on behalf of or pledge the credit of or otherwise bind or oblige the other Party.

22.4 Nothing contained in this Agreement shall prevent either Party from working with any third party on projects other than the Projects.

22.5 No failure or delay by IDG and/or DeLorean in exercising any of its rights under this Agreement shall be deemed to be a waiver of that right, and no waiver by IDG and/or DeLorean of any breach of this Agreement by IDG and/or DeLorean shall be considered as a waiver of any subsequent breach of the same or any other provision.

22.6 All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed to be properly given when actually received by the person entitled to receive the notice at the address stated below, or at such other address as IDG or DeLorean may provide by notice to the other:

To DeLorean

DeLorean Motor Company, Inc.

907 Billy Mitchell Blvd.

Ste. 101

San Antonio, TX 78226

USA

For the attention of: Dean G. Hull

E-mail: dean@delorean.com

With copy

For the attention of: Mark Malvern, Esq.

E-mail: mmalvern@dykema.com

CONFIDENTIAL

To IDG

Italdesing Giugiaro S.p.A.

Via Achille Grandi, 25

10024 – Moncalieri

Torino, Italy

For the attention of: Andrea Porta

E-mail: andrea.porta@italdesign.it

With copy

For the attention of: Giorgio Gamberini

E-mail: giorgio.gamberini@italdesign.it

22.7 Neither Party will make any public or press announcement of the Agreement except as required by law or regulate on of statutory authority or stock exchange unless such announcement is mutually agreed between the Parties.

22.8 The language for communication, training and training manuals and correspondence between the Parties in respect of the provision of the Projects shall be English.

22.9 Each remedy of a Party is cumulative with each other remedy contained in this Agreement and with all other remedies available to that Party at law, in equity, and otherwise, and no pursuit of any particular remedy will constitute an exclusive election of any particular remedy.


## 23. LAW AND DISPUTE RESOLUTION

23.1 The Parties agree that this Agreement shall be governed and construed in accordance with the law of England and Wales, without regard to any conflicts of law provisions.

23.2 Should any dispute arise out of this Agreement, including the interpretation thereof or any other matter specifically referred to herein, the Parties agree to negotiate for the settlement thereof by the following procedure:

The Parties shall use all reasonable endeavours to promptly negotiate in good faith and settle amicably any dispute that may arise out of or relate to this Agreement or a breach thereof within 14 Business Days of notification by one Party to the other of such dispute. If any such dispute cannot be settled amicably through ordinary negotiations by appropriate representatives of the Parties within such 14 days period, the dispute shall be immediately referred to the Project Managers and the Legal Departments of both Parties who shall meet (either by themselves or through their authorized representatives and either in person, by telephone or through such other means of communication as may be agreed between them) in good faith within 14 Business Days of the request of either Party in order to attempt to resolve the dispute within a further 14 Business Days from the initial date of such meeting.

23.3 In the event that the Parties are unable to resolve the dispute pursuant to Article 23.2 within 6 weeks, or either Party at any time, acting reasonably, no longer considers that the matter may be resolved amicably, the dispute shall be exclusively settled by arbitration in the English language before one arbitrator under

the administration of the International Centre for Dispute Resolution, and according to its International Arbitration Rules. The seat of the arbitration will be England, and the place of hearing will be London, England. A Party may seek interim injunctive relief under these Rules and before any court having jurisdiction, and each Party hereby submits to the personal jurisdiction of any court reasonably chosen by the initiating Party for such purposes. The initiating Party shall reimburse the other Party's costs if the court declines jurisdiction. The arbitral panel will be empowered to grant injunctive relief upon application. Awards of the arbitral panel will be enforceable in any court having jurisdiction, and each Party hereby submits to the personal jurisdiction of any court reasonably chosen by the enforcing Party for such purposes. The enforcing Party shall reimburse the other Party's costs if the court declines jurisdiction.

The Parties have caused this Agreement to be executed on the day and year that it has been signed by both Parties in two (2) counterparts, each Party retaining one (1) :

SIGNED for and on behalf of
DeLorean Motor Company, Inc.

Signature _____
Title: CEO
Date: 19th July 2022

SIGNED for and on behalf of
Italdesign – Giugiaro S.p.A.

Signature _____
Title: CEO
Date: 19th July, 2022

Signature _____
Title: Business Development Director
Date: 19th July, 2022

**Attachments**

Attachment 1 – Statement of Work Template

Attachment 2 – Change Order Template

Attachment 3 – Acceptance Report Template

Attachment 4 – DeLorean's Notices to proceed

CONFIDENTIAL

## Attachment 1

### STATEMENT OF WORK – PROJECT *[insert Project's letter]*

1.    **Introduction.** This Statement of Work ("***Statement of Work***") is issued under and pursuant to the Master Project Agreement by and between DeLorean Motor Company, Inc. ("***DeLorean***") and Italdesign-Giugiaro S.p.A. ("***Supplier***"). Capitalized terms used but not defined in this Statement of Work will have the meanings given them in the Agreement. The Term of this Statement of Work shall be from *[date]* (the "***Effective Date***") until delivery of the Deliverables and/or Products.

2.    **Services.**

With reference to the Project *[insert Project's name/code]*, Supplier will provide the following Deliverables and/or Products pursuant to this Statement of Work *[describe activities/services, any Deliverables, any Products and any deadlines or milestones]*:

- E.g.: Engineering development services for DeLorean's Project *[insert Project's letter]* pursuant to Supplier's Offer dated _____ ("Offer") and Supplier's Technical Agreement ("Annex 2"), which are hereby incorporated and attached hereto.

3.    **Acceptance**. The Deliverables and/or Products shall be subject to the Acceptance procedure set forth in Article 5 of the Agreement.

4.    **Compensation.** With reference to Article 9 (Compensation and terms of payment) of the Agreement, DeLorean will pay Supplier the amount of Euro *(insert total amount)* _____ for performance of the Deliverables or provision of the Products under this Statement of Work as follows *(e.g., price and any deadlines or milestones)*:

- Per Annex 5 – Payment Planning

5.    **Additional Deliverables and/or Products.** DeLorean may request additional Deliverables and/or Products after the Effective Date subject to the procedure set forth in Article 6 (Change Management).

6.    **Facilities.** The Parties agree that Supplier will perform the Deliverables and the Products under this Statement of Work at or from the following facilities:

- *[insert place address]*

Intending to be legally bound, each of the undersigned parties has caused its duly authorized representative to execute this Statement of Work as of the date last entered below.

DeLorean Motor Company, Inc.                    Italdesign – Giugiaro S.p.A.

Signature _____                Signature _____

Date:  /  /                                     Date:   /  /

Attachment 2

Change Order

| SECTION A<br>Agreement Details (the "Agreement") |
| --- |
| Agreement Name: |
| Agreement Reference No. (if any): |
| Contracting Parties: |
| Requesting Party: |
| Date of Agreement: |
| Title of Proposed Change (not mandatory): |

| SECTION B<br>Details of proposed Change |
| --- |
| **Type of Change:** |
| **Reason for the proposed Change:** |
| **Description of the proposed Change:** |

| SECTION C<br>Impact Estimates<br>(For information, impact assessment and resource planning only) | |
| --- | --- |
| ☐ Costs<br>☐ Delivery date / timetable / other date<br>☐ Performance<br>☐ Resources<br>☐ Other system | ☐ Documentation<br>☐ Training needs<br>☐ Third party<br>☐ Agreement<br>☐ Other (please specify)<br><br>…………………………………………………….. |
| **Description of impact(s):** | |

| SECTION D<br>Costs |
| --- |

CONFIDENTIAL

**Charge implications of the proposed Change:**

**Who is to bear the cost of the proposed Change:**

- ☐ DeLorean
- ☐ Italdesign
- ☐ Other ....................................................................................................
  *[please specify]*

| **SECTION E** |
| :---: |
| **Implementation** |

**Effective date of Change:**

**Acceptance procedures:**

Acceptance shall be in accordance with the terms of the Agreement.

| **On behalf of** | **On behalf of** |
| --- | --- |
| Signature:_____ | Signature:_____ |
| Name:_____ | Name:_____ |
| Title/:_____ | Title/:_____ |
| Date | Date |

CONFIDENTIAL

**Attachment 3**

| |
|---|
| **Acceptance Report** <br><br> **dated** _____ <br><br> to the Agreement <br><br> n._____ <br><br> dated _____ |
| IDG presents this executed Acceptance Report to DeLorean in accordance with the Agreement No.[/or name the Agreement] _____ dated _____ to confirm that IDG has completed the Deliverable _____ required by section _____ of the Annex 3 (Technical Agreement). <br><br> 1. DeLorean hereby accepts the following Deliverables: <br><br> [*TBD*] <br><br> 2. The cost for the abovementioned Deliverable is Euro _____ to be invoiced by IDG upon signature of this Acceptance Report and paid by DeLorean within 30 calendar days as from date of invoice. <br><br><br> 3. This Acceptance Report is executed in two (2) original copies in English, one copy for DeLorean and one original copy for IDG. <br><br><br> 4. This Acceptance Report constitutes an integral part of the Agreement. |

| On behalf of | On behalf of |
|---|---|
| _____ | _____ |
| Signature:_____ | Signature:_____ |
| Name:_____ | Name:_____ |
| Title/:_____ | Title/:_____ |
| Date_____ | Date_____ |
| Seal | Seal |

*End Of The Form*

CONFIDENTIAL

## Attachment 4

DeLorean's Notices to proceed

CONFIDENTIAL